******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOHN A. FRAZIER
## (AC 38880)

Keller, Prescott and Bishop, Js.

*Syllabus*

Convicted of the crime of operating a motor vehicle while under the influence of intoxicating liquor, and of having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor, the defendant appealed to this court. He claimed, inter alia, that the evidence was insufficient to prove that he was intoxicated due to alcohol consumption. The defendant had been found by a police officer in the driver's seat of his vehicle, which was stopped in the left turn lane of a road at a traffic signal with the engine running. The defendant initially did not respond to the officer's inquiries as to whether he was alright. The officer was able to rouse the defendant after he entered the vehicle and shook the defendant's shoulders. The defendant replied affirmatively to the officer's inquiry as to whether he was diabetic but did not respond when the officer asked what, if any, medication he was taking for his condition. The defendant also told the officer that he had consumed a couple of drinks and was very tired, and he asked the officer not to arrest him. After the defendant failed to satisfactorily complete certain standard field sobriety tests administered by the officer, he was arrested and the contents of his vehicle were inventoried. Another officer discovered a cup in the vehicle's center console that contained ice and a beverage that smelled like it contained alcohol. *Held*:

1. The defendant could not prevail on his claim that the evidence was insufficient to prove that he was intoxicated due to alcohol consumption, as there was ample evidence from which the jury reasonably could have concluded beyond a reasonable doubt that alcohol was the cause of his condition: the defendant, who was found stopped at an intersection with his vehicle's engine running, was unable to perform the sobriety tests administered by the police, he told the police that he had consumed a couple of drinks and was very tired, testimony from the police officer who administered the sobriety tests supported an inference that the defendant was under the influence of alcohol, as the officer testified that he smelled a sweet aroma when he entered the defendant's vehicle, and the police later discovered in the defendant's vehicle a cup that contained ice and what smelled to them like an alcoholic beverage; moreover, the defendant's conduct during the encounter with the police reflected that he knew that he had done something wrong, as he repeatedly asked for leniency and not to be arrested, and the jury reasonably could have inferred from his refusal to submit to a breath test that he had consumed alcohol and that if he truly had been suffering from a medical condition, he would not have repeatedly asked the police to give him a break and would have taken whatever steps he could to obtain medical attention.

2. The trial court did not abuse its discretion by concluding that defense counsel opened the door to the admission of testimony by a police officer about the cup that contained the alcoholic beverage: although that court had excluded inquiry with respect to the inventory form or the contents of the defendant's automobile, during cross-examination defense counsel delved into the subject of what the officer had discovered in the defendant's automobile by asking if any contraband had been found, as it would have been reasonable for the jurors, as laypersons, to interpret defense counsel's questions about whether the police had found any contraband in the defendant's vehicle as being related to anything that would have implicated the defendant in illegal conduct, and because defense counsel's inquiry and the officer's answer reasonably could have left the jury with the false impression that the officer did not find any incriminating evidence in the automobile, and defense counsel, aware of the court's previous ruling, had attempted to selectively introduce parts of that excluded inquiry in an attempt to advantage the defense, that selective approach was prejudicial to the state; moreover, the prosecutor's brief inquiry during redirect examination did not

exceed the questioning necessary to remove the unfair prejudice that was caused by defense counsel's inquiry, and even if the admission of the evidence was an abuse of discretion, the defendant did not demonstrate that the court's ruling affected the jury's verdict, as the state presented a strong case that the defendant was intoxicated.

3. The defendant's unpreserved claim that the trial court infringed on his right to testify was unavailing, as the defendant waived his claim that he was prematurely forced to make a decision about whether to testify when the court canvassed him prior to the conclusion of the state's case-in-chief; defense counsel's representation to the court, prior to the close of the state's case-in-chief, that he had asked the defendant to come to court early so that he could be canvassed prior to the beginning of the case that day, reasonably implied that it was appropriate for the canvass to take place before the jury was expected to be in court to resume hearing evidence in the state's case-in-chief, and the defendant was unable to demonstrate that a constitutional violation existed because he did not affirmatively state that he wanted to testify or that he did not know that he could testify.

Argued December 5, 2017—officially released April 10, 2018

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crime of operating a motor vehicle while under the influence of intoxicating liquor and, in the second part, with having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor or drugs, brought to the Superior Court in the judicial district of New Britain, geographical area number fifteen, where the first part of the information was tried to the jury before *D'Addabbo, J.*; thereafter, the court granted in part the defendant's motion for a judgment of acquittal as to the first part of the information; verdict of guilty; subsequently, the defendant was presented to the court, *Hadden, J.*, on a plea of nolo contendere to the second part of the information; thereafter, the court, *D'Addabbo, J.*, rendered judgment in accordance with the verdict and plea, from which the defendant appealed to this court. *Affirmed.*

*Deborah Del Prete Sullivan*, director of legal counsel, Public Defender Services Commission, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, and *Elizabeth M. Moseley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, John A. Frazier, appeals from the judgment of conviction, rendered following a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a (a) (1). Additionally, following a plea of nolo contendere, the defendant was convicted under a part B information of being a second offender in violation of General Statutes § 14-227a (g) (2).[1] The defendant claims that (1) the evidence was insufficient to prove his guilt under § 14-227a (a) (1), (2) the trial court improperly admitted certain evidence in the state's case, and (3) the court infringed on his right to testify. We affirm the judgment of the trial court.

On the basis of the evidence admitted at trial, the jury reasonably could have found the following facts. On the evening of August 20, 2011, the defendant was seated in the driver's seat of a sedan-type automobile that was stopped in a left turn only lane on the southbound side of the Berlin Turnpike at its intersection with New Park Drive in Berlin. At that time, sixteen year old Dakota Kibby, Kibby's boyfriend, and Kibby's friend were passengers in an automobile that was being operated by Kibby's mother. Kibby's mother, who was traveling southbound on the Berlin Turnpike and intended to turn left at the intersection with New Park Drive, stopped behind the defendant's automobile. The white-colored backup lights on the defendant's automobile were illuminated and the automobile's engine was running. Despite the fact that the traffic signal at the intersection turned green, however, the automobile remained stationary. After the defendant failed to proceed through the intersection, Kibby's mother drove around him.

As they passed the defendant's automobile, the occupants of the automobile being driven by Kibby's mother observed the defendant hunched over his steering wheel. Kibby's mother stopped her automobile a safe distance away from that of the defendant. Concerned for the defendant's well-being, Kibby, her boyfriend, and her friend got out of their automobile and approached the defendant. They attempted to get the defendant's attention by yelling to him. The defendant appeared to be dazed and confused, as though he was waking up. Then, his automobile started moving in reverse. Kibby and her companions alerted the defendant to stop the automobile, at which point it stopped moving and the defendant appeared to fall back to sleep. Kibby called 911.

Shortly before midnight, James Gosselin, a lieutenant with the Berlin Police Department, responded to the scene. Gosselin encountered the occupants of the automobile that was driven by Kibby's mother, all of whom were standing on the center median of the Berlin Turn-

pike. Then, Gosselin approached the defendant's automobile, which was still running with the defendant seated in the driver's seat. The rear brake lights as well as the automobile's headlamps were illuminated. Gosselin tapped on the driver's side window and asked the defendant whether he was alright, but the defendant did not respond. The defendant was seated upright with his eyes closed and his head tilted back against the headrest. The defendant had his right foot on the brake pedal.

Initially, Gosselin was concerned that the defendant was suffering from a medical condition. He opened the passenger door, called loudly to the defendant, and shook the defendant's shoulders. Still, the defendant did not reply. Gosselin shifted the automobile into park, turned off the ignition, and removed the keys from the ignition. After Gosselin shook the defendant some more, the defendant merely opened his eyes. When Gosselin asked the defendant if he was a diabetic, he responded that he was, yet he did not respond when Gosselin asked him what type of medication, if any, he was taking for this condition. Gosselin requested that an ambulance respond to the scene, but the defendant refused to be evaluated by emergency medical personnel. When the ambulance arrived on the scene, Gosselin motioned to the ambulance driver not to stop. By this time, Berlin Police Officer Eric Chase arrived on the scene to provide backup assistance to Gosselin, including monitoring oncoming traffic.

The defendant complied with Gosselin's request to present his driver's license and vehicle registration. Repeatedly, the defendant asked Gosselin not to take any adverse action toward him[2] and, at one point during the encounter, the defendant showed Gosselin a silver shield. Gosselin asked the defendant if he had consumed any alcohol, to which the defendant replied that he had consumed "a couple of drinks" and that he was "very tired."

The defendant complied with Gosselin's request that he step out of his automobile, although he was unsteady on his feet. Gosselin administered three field sobriety tests to the defendant, namely, the horizontal gaze nystagmus test, the walk and turn test, and the one leg stand test. The defendant did not complete any of these tests satisfactorily. Due to the defendant's unsteadiness during the testing process, Gosselin was concerned for the defendant's safety and took precautions to protect the defendant from falling to the ground.

After he had administered the field sobriety tests, Gosselin arrested the defendant, put handcuffs on him, and transported him to police headquarters. The defendant became angry and, as he had done throughout their encounter, pleaded with Gosselin to give him a break and not to arrest him. While being transported to police headquarters, the defendant told Gosselin that

being arrested was the "last thing" he needed and asked for "a last chance." Upon taking an inventory of the contents of the defendant's automobile, which was towed by a private towing company following the defendant's arrest, Chase discovered a plastic cup in the center console that contained ice as well as a beverage that smelled like it contained alcohol. Later, Gosselin asked the defendant to submit to a breath test, but the defendant refused.[3] Additional facts will be discussed as necessary.

I

First, the defendant claims that the evidence was insufficient to prove that he violated § 14-227a (a) (1) by operating a motor vehicle while under the influence. We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found

credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Campbell*,     Conn.     ,     , A.3d     (2018).

In part II of this opinion, we will adjudicate the defendant's claim that the court improperly admitted certain evidence, namely, testimony concerning a beverage that the police discovered in the defendant's automobile. In our review of the sufficiency of the evidence, however, we are free to consider *all* of the evidence presented at trial. Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error and do not depend on an initial determination of evidentiary claims. See, e.g., *State* v. *Calabrese*, 279 Conn. 393, 401–402, 902 A.2d 1044 (2006); *State* v. *Carey*, 228 Conn. 487, 496, 636 A.2d 840 (1994).

Section 14-227a (a) (1) provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle (1) while under the influence of intoxicating liquor or any drug or both . . . ." In the present case, the state alleged in its original long form information that the defendant committed the crime while he was "under the influence of alcohol and drugs . . . ." Following the state's case-in-chief, the defendant argued that the evidence did not support a finding that he was under the influence of either alcohol *or* drugs, and moved for a judgment of acquittal. The court denied the motion with respect to the allegation of alcohol use, but granted the motion with respect to the allegation of drug use. At the court's direction, the state filed a second long form information in which it alleged that the defendant had committed the offense while under the influence of alcohol. The case was submitted to the jury under the theory that the defendant operated his automobile while under the influence of alcohol.

Thus, to obtain a conviction in the present case, the state bore the burden of proving beyond a reasonable doubt that the defendant operated a motor vehicle while he was "under the influence of intoxicating liquor . . . ." General Statutes § 14-227a (a) (1). The defendant does not claim that the evidence was insufficient to satisfy the essential element of operation. Instead, he argues that the evidence was insufficient to prove that he was intoxicated due to alcohol consumption.

"To demonstrate that a defendant violated § 14-227a (a) (1), the state is required to show that, as a result

of the consumption of intoxicating liquor, the defendant had become so affected in his mental, physical or nervous processes that he lacked to an appreciable degree the ability to function properly in relation to the operation of his vehicle." (Internal quotation marks omitted.) *State* v. *Mosback*, 159 Conn. App. 137, 157, 121 A.3d 759 (2015); see also *State* v. *Morelli*, 293 Conn. 147, 154, 976 A.2d 678 (2009); *State* v. *Fontaine*, 134 Conn. App. 224, 227, 40 A.3d 331, cert. denied, 304 Conn. 926, 41 A.3d 1051 (2012).

We begin our assessment of the evidence by observing that it plainly reflected that the defendant had become so affected in his mental, physical or nervous processes that he lacked to an appreciable degree the ability to function properly in relation to the operation of his automobile. The defendant does not appear to dispute this obvious fact. The defendant was found stopped at an intersection while his automobile's engine was running. He was not observing the traffic signal at the intersection, but instead had become an impediment to travel. Kibby and other occupants of her automobile discovered him to be slouched over his steering wheel, and they were unable to rouse him. Gosselin was unable to rouse the defendant until he entered his automobile, yelled at him, and shook him several times. Thereafter, the defendant was unable to perform the standard field sobriety tests satisfactorily and was unsteady on his feet.

There was ample evidence from which the jury reasonably could have inferred that alcohol was the cause of the defendant's condition. The most compelling evidence in this regard came in the form of the defendant's statements to Gosselin. Gosselin testified that after he entered the defendant's automobile and the defendant's condition had improved to the extent that he was able to respond to questions, Gosselin asked him whether he had a medical condition and, specifically, whether he was a diabetic. The defendant responded, "yes," but did not respond to Gosselin's further inquiries concerning diabetes. After the defendant refused to answer any questions concerning the treatment of his alleged diabetic condition and refused to be evaluated by emergency medical personnel, conduct from which the jury reasonably could have inferred that his condition was not the result of any type of medical emergency, Gosselin asked him if he had consumed any alcohol. The defendant replied that he had consumed a "couple of drinks" and that he was "very tired."

The defendant argues that his admission that he had consumed a couple of drinks lacked substantial probative value because "[t]he time of consumption was never established." The defendant's argument does not take into account the circumstances in which this statement was made. These circumstances afforded the jury a basis on which to conclude that the defendant's state-

ment served as a basis to infer that he was intoxicated due to alcohol consumption. Specifically, we observe that Gosselin asked the defendant about alcohol consumption while he was on a public roadway evaluating the defendant. This was soon after he had arrived at the scene. In light of the circumstances, the jury reasonably could have inferred that, by the time he was answering questions and repeatedly asking the police for leniency, the defendant would have understood the inquiry to be related directly to the cause of his then-existing condition. Thus, it would have been reasonable for the jury to have inferred that the defendant's reply that he had consumed "a couple of drinks" and was "very tired" was an admission to Gosselin that his consumption of alcohol occurred close enough in time to have caused his then-existing condition.

Additionally, Gosselin testified that on the basis of his observations as well as his training and experience, the defendant was intoxicated. Gosselin's testimony concerning the defendant's performance on the standardized field sobriety tests, which detailed the defendant's difficulty in following instructions and completing relevant tasks, supported an inference that he was under the influence of alcohol. Gosselin testified on the basis of his training that the National Highway Traffic Safety Administration had concluded that the three tests that he administered were considered to be reliable predictors of intoxication and that the horizontal gaze nystagmus test, in particular, was 77 percent accurate in predicting intoxication.

In arguing that the evidence did not support a finding of intoxication, the defendant relies on Gosselin's testimony that, when he first arrived on the scene and was unable to wake the defendant, he was concerned for the defendant's safety and believed that the defendant might have been suffering from a "diabetic emergency . . . ." The defendant strongly relies on Gosselin's first impressions upon his arrival at the scene. He seemingly downplays, however, the significance of the conclusions that Gosselin reached after having had an opportunity to observe and evaluate the defendant in greater detail. Certainly, it would have been reasonable for the jury to have found that the opinion that Gosselin reached, on the basis of additional facts, was more accurate than his initial impression and, thus, more persuasive. It is not compelling in our evaluation of the evidence that Gosselin initially may have considered the possibility that the defendant was suffering from a diabetic emergency because, subsequently, Gosselin learned a great deal more information about the defendant's condition and, on the basis of this additional information, ultimately concluded that the defendant was intoxicated.

There was yet additional evidence before the jury that reasonably bolstered an inference that alcohol con-

sumption was the cause of the defendant's condition. Gosselin testified that, upon entering the defendant's automobile, he "was immediately hit with the smell of a sweet aroma of something . . . ." Chase testified that, following the defendant's arrest, he took an inventory of items inside of the defendant's automobile. He testified in relevant part: "While I was in the vehicle, I saw in the center console a plastic cup with ice, and it was [a] drink that I smelled, and it [smelled] like an alcoholic beverage." This evidence, viewed in isolation, was not conclusive evidence of alcohol consumption. In light of the evidence in its entirety, however, it bolstered a finding that the sweet smell that Gosselin detected when he entered the automobile was the result of the defendant's breath and that the cup in the console contained intoxicating liquor. Such subordinate findings supported a finding that the defendant was intoxicated.

Additionally, the defendant's conduct throughout his encounter with Gosselin reflected that he knew that he had done something wrong. Gosselin and Chase testified that the defendant repeatedly asked that Gosselin not take any action toward him. Chase testified that, during the field sobriety tests, the defendant "was pleading . . . that he receive a break and that we not arrest him." A video recording from Gosselin's police cruiser reflected that the defendant stated that an arrest was the "last thing" he needed and that he wanted "a last chance."[4] In light of similar circumstances, this court has observed that statements that reflect an acknowledgement of wrongdoing support a finding of operating under the influence of intoxicating liquor. See, e.g., *State* v. *Fontaine*, supra, 134 Conn. App. 228–29. Moreover, Gosselin testified that, in an attempt to escape punishment, the defendant showed him a silver shield. Certainly, the defendant was under no obligation to prove his innocence or to disprove the state's case. We observe, however, that his theory of defense was that his condition was attributable to a diabetic emergency. In applying its common sense, the jury reasonably could have inferred that, if he truly had been suffering from a medical condition, he would not have repeatedly asked the police to give him a break and would not have displayed a silver shield, but that he would have taken whatever steps he could to obtain medical attention and alert the police to his condition. All of the evidence suggesting that the defendant was aware of his wrongdoing further supported a finding by the jury that his conduct and condition on August 20, 2011, was attributable to alcohol intoxication.

Additionally, it was permissible for the jury to infer from the defendant's refusal to submit to a Breathalyzer test that he had consumed alcohol. See, e.g., General Statutes § 14-227a (e);[5] *State* v. *Weed*, 118 Conn. App. 654, 664–65, 984 A.2d 1116 (2009). "It is reasonable to infer that a refusal to take such a test indicates the defendant's fear of the results of the test." *State* v.

*Seekins*, 123 Conn. App. 220, 229, 1 A.3d 1089, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010). The parties stipulated, and the jury was instructed, that the defendant refused Gosselin's request that he submit to a Breathalyzer test.

We conclude our analysis by observing that there is no mathematical formula by which the state is bound to satisfy its burden of proving intoxication beyond a reasonable doubt. Instead, we, as a reviewing court, must examine the evidence in its totality, *viewed in the light most favorable to sustaining the jury's finding of guilt*, to determine whether the jury reasonably could have determined that the state satisfied its burden of proof. A careful analysis of the evidence necessarily is case specific. Thus, the defendant's attempts to point to what he perceives to be weakness in the state's case, or parallels between the present case and other cases, are not compelling. The jury reasonably could have concluded that the evidence presented by the state proved beyond a reasonable doubt that the defendant was intoxicated.

## II

Next, the defendant claims that the court improperly admitted certain evidence, namely, Chase's testimony related to a beverage that he found in the center console of the defendant's automobile.

The following additional facts are relevant to the present claim. During his direct examination by the prosecutor, Chase testified that, after Gosselin administered the field sobriety tests and arrested the defendant, his responsibility was to inventory the contents of his automobile and to arrange to have it towed away. He testified that, in such a situation, it is standard procedure for a police officer to inspect the automobile and to create a written log that details its contents. He testified that these tasks are performed by the police as part of its community caretaker function. Chase explained: "Many times, a defendant will get out of the vehicle, they'll leave their wallet or cell phone or purse or an item of value. Many times, we'll remove that. I'll note that on the form if it's something in the vehicle, like, they may have a book of compact discs that could be valuable, you'll note that on the form, that way when the person goes to pick up their car, if there's something missing at the [wrecker] service, there's documentation that those items were, in fact, in the vehicle." Chase testified that he followed this procedure in the present case.

The prosecutor showed Chase an exhibit marked for identification purposes.[6] Chase stated that the exhibit was the "possessed vehicle inventory form" that he completed and signed with respect to the defendant's automobile. He stated that the form "lists the owner of the vehicle, the vehicle information, the towing com-

pany where the vehicle went, and items that were inside of the vehicle." When the state asked that the form be admitted into evidence, the defendant objected and asked the state to make an offer of proof with respect to the relevance of the form. Defense counsel also asked for an opportunity to conduct a voir dire examination of Chase.

Outside of the presence of the jury, defense counsel argued that the form was not relevant and had "no evidentiary value whatsoever." The prosecutor stated that the form was an admissible business record and that it was relevant with respect to an item listed on the form, specifically, a plastic cup containing ice and an alcoholic beverage.

In relevant part, defense counsel conducted a voir dire examination of Chase, as follows:

"Q. If there were items of contraband, drugs, weapons, would those be inventoried or would those be seized by the department?

"A. Those would be seized.

"Q. So, with respect to the items that you inventoried and appear on that form, none of those items were seized, is that correct?

"A. That's correct.

"Q. So, they were not logged into evidence or saved or retained for possible evidentiary document?

"A. No sir. . . .

"Q. The state referenced that the inventory form in front of you references a cup with an alcoholic beverage in it. Is that what the form says?

"A. It says a drink with ice in the center console."

Defense counsel argued that there was no credible evidence that the cup in the console contained an alcoholic beverage because the form did not state that fact and that "without chemical testing, to allow the jury to be given the impression that it contained an alcoholic beverage without the proper foundation . . . is irrelevant at this point."

The prosecutor conducted a voir dire examination of Chase in relevant part as follows:

"Q. [W]hat was one of the items of significance that you found within that vehicle that night, and where was it located, sir?

"A. The drink with the ice in the center console.

"Q. Okay, and did you pick up that cup?

"A. Yes, I did.

"Q. And exactly what does the form say?

"A. It says a drink with ice in the center console, and

then I note that I removed it and discarded it.

"Q. And did you smell that . . . the contents of that cup?

"A. Yes, I did.

"Q. And what did it smell [like]?

"A. It smelled like an alcoholic beverage."

Defense counsel argued that the prosecutor's inquiry with respect to the scent of the beverage called for an expert opinion. The court stated that a lay witness could testify with respect to things such as odor and appearance and, thus, permitted the inquiry.

Defense counsel then conducted further inquiry of Chase:

"Q. Officer, isn't it true that alcohol has no smell?

"A. I don't believe that's true.

"Q. It's, in fact . . . the flavor that has the smell. Alcohol itself has no smell.

"A. I believe it does have a smell.

"Q. What did it smell like?

"A. It smelled like an alcoholic beverage.

"Q. What kind of alcohol?

"A. I don't know what kind of alcohol.

"Q. It smell like beer?

"A. It definitely was not beer. It was a mixed drink, I would say.

"Q. And officer, just so we're clear, you didn't find any other contraband in the vehicle, did you?

"A. Contraband, no sir.

"Q. No drugs?

"A. No, sir.

"Q. No weapons?

"A. No, sir."

Following this additional examination of Chase, the prosecutor reiterated that the inventory form was admissible as a business record because it was prepared according to standard police procedure. The prosecutor argued that the form reflected Chase's notation that he had discovered a cup with a beverage and ice in it, and that it was proper for Chase to testify with respect to the fact that he smelled the beverage and believed it to be alcoholic in nature. Defense counsel argued that the form did not reflect that Chase found an alcoholic beverage in the automobile and objected to the state asking Chase "what the drink that no longer exists smelled like." Thus, defense counsel clarified that he objected to the admission of the form as well as to

Chase's testimony concerning the beverage.

Following a brief recess, the court issued a ruling that excluded from the evidence both the inventory form and Chase's testimony concerning the cup, as follows: "[T]he court has had an opportunity to review the testimony that was presented and the issues presented as well as the argument presented. The court looks at this issue as more of a destruction of evidence issue . . . which has now been fully litigated. But the court, in making rulings, in addition to following the law, also tries to make sure that it follows what it believes is fundamental fairness. It's always controlling. So, what I'm left [with] here is a cup which was in the inventory with ice in it that was discarded, not saved, which is in the inventory, which is step one, which, in and of itself, the court, on an evidentiary basis, doesn't have too much of a problem allowing that in, provided that the foundations of the business record were established. However, what the court, also, sees with that [inventory form] coming in, is the potential of speculation for the jury to think what was in there, and they would be forced to speculate [about the contents of the cup], which is not in evidence. And the testimony by this officer that . . . he believed it to be an alcoholic beverage [that has been] discarded causes the court to have some concerns about how the jury will take it as it relates to fundamental fairness. So, for those reasons, the court will sustain both objections."

After the jury returned to the courtroom, the prosecutor concluded her direct examination of Chase. Chase testified that he had completed an inventory of the contents of the defendant's automobile and then it was towed by a service located on the Berlin Turnpike. The prosecutor did not ask any questions with respect to the contents of the automobile. Thereafter, defense counsel cross-examined Chase. After Chase testified that there were different tests by which police could determine drug use and alcohol use, the following examination occurred:

"Q. Now, you indicated that you inventoried the car . . . for the purpose of ensuring that the person's belongings were available when they picked up the car?

"A. Yes, sir.

"Q. If you, during that inventory, were to find contraband, be it weapons, obviously stolen property, or drugs, what would you do in that situation?

"A. Those items would be seized and brought to the station as evidence.

"Q. As evidence. In this particular case, when you inventoried the car, did you find any drugs?

"A. No, sir.

"Q. Thank you, no more questions."

The prosecutor began her redirect examination as follows:

"Q. Now, Officer Chase . . . [defense counsel] just asked you about when you inventoried the car. Did you find anything else of significance?

"A. Uh—

"Q. Inside the vehicle, in the center console?

"A. Yes, I found a plastic cup with ice and a—"

Defense counsel then raised an objection to the inquiry on the ground that the court already had decided the issue. After the court excused the jury, defense counsel, apparently recognizing that the prosecutor would argue that he had opened the door to the inquiry during cross-examination, stated that he "simply asked [Chase] with respect to the drug issue whether he found any drugs and he answered no." The prosecutor argued that defense counsel had opened the door to this inquiry by asking Chase about the inventory and whether Chase found contraband or drugs in the automobile. The court ruled: "[With respect to] the inventory of the cup with the ice in—the court was concerned about speculation of the jury, and the court was, also, concerned about its loss—its destruction. The court's ruling was based primarily upon fundamental fairness, but at the same time, you can't use a ruling as a shield and then a sword. The court believes that by inquiring about the inventory, and what they would have found and what he could have found, opened the door of what he found. And it is unfair, this court feels, to use the court's ruling because I wanted to be fair to the defense—to use the court's ruling about something that was in the vehicle and not kept, then not talk about that, but then lead the jury to another area that was using the court's ruling, the court feels inappropriately. Objection is overruled for that reason."

When the jury returned to the courtroom, the prosecutor examined Chase in relevant part as follows:

"Q. Officer Chase, you testified a few moments ago that you inventoried the car, is that correct?

"A. That's correct.

"Q. And what did you find in the center console of [the defendant's] vehicle?

"A. While I was in the vehicle, I saw in the center console a plastic cup with ice, and it was [a] drink that I smelled, and it [smelled] like an alcoholic beverage.

"Q. Okay, and what did you do with that drink at that point?

"A. I poured the drink on the side of the road."

The defendant argues that the court abused its discretion by concluding that defense counsel opened the

door to the admission of this testimony. In arguing that the ruling cannot be considered harmless, the defendant argues that, for a number of reasons, it was highly prejudicial to the defense and that the state's case was not strong. The defendant argues that, in light of Chase's admission that he intentionally destroyed the beverage, the court was correct in determining that fundamental fairness to the defense required the exclusion of Chase's testimony. Moreover, the defendant argues, Chase's "damaging" testimony, related to the central issue of intoxication, "would absolutely rouse the suspicion and speculation of the jury" against the defendant and, thus, was highly prejudicial.

"We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "Generally, a trial court abuses its discretion when the court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . When this court reviews a decision of the trial court for abuse of discretion, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable. . . . Accordingly, the abuse of discretion standard reflects the context specific nature of evidentiary rulings, which are made in the heat of battle by the trial judge, who is in a unique position to [observe] the context in which particular evidentiary issues arise and who is therefore in the best position to weigh the potential benefits and harms accompanying the admission of particular evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 832, 135 A.3d 1 (2016).

"Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice

which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal. . . . We review for abuse of discretion the trial court's determination that a party has opened the door to otherwise inadmissible rebuttal evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Brown*, 309 Conn. 469, 479–80, 72 A.3d 48 (2013); see also *State* v. *Graham*, 200 Conn. 9, 13–14, 509 A.2d 493 (1986).

In the present case, after the court excluded inquiry with respect to the inventory form or the contents of the defendant's automobile, during cross-examination defense counsel delved into the subject of what Chase discovered in the automobile. The defendant argues before this court that defense counsel's inquiry was legitimate because it was tailored to the issue of whether Chase had discovered something that was illegal for the defendant to possess, such as illegal drugs, in the automobile. In arguing that defense counsel's inquiry did not concern the subject of the court's ruling, which was alcohol in the automobile, the defendant focuses on defense counsel's use of the word "contraband" in his questioning of Chase. The defendant relies on the definitions of "contraband" found in sources including Black's Law Dictionary and our statutes, which generally define "contraband" as property that is illegal to possess.

The defendant interprets defense counsel's choice of words in a legally precise manner, yet it would have been reasonable for the laypersons on the jury to have afforded his words a broader interpretation. Thus, in light of the context of defense counsel's inquiry, it would have been reasonable for the jury to interpret the question as being related not merely to anything in the automobile that would have been illegal for the defendant to possess, but anything that would have implicated the defendant as having engaged in illegal conduct. Viewed in this manner, defense counsel's inquiry and Chase's answer reasonably could have left the jury with the false impression that Chase did not find *any* incriminating evidence in the automobile. Defense counsel obviously was aware of Chase's voir dire testimony and the court's ruling that limited the state's inquiry. Nonetheless, he attempted to selectively introduce parts of the excluded inquiry concerning Chase's inventory of the contents of the automobile in an attempt to advantage the defense. This selective approach was prejudicial to the state because the court's prior ruling had prohibited the state from placing Chase's testimony in its proper context by presenting evidence that he also discovered evidence that unquestionably was incriminating with respect to the issue of whether the defendant was intoxicated, namely, the cup in the center console that, in Chase's belief, con-

tained an alcoholic beverage. As this court has observed, "[t]he defendant cannot reap the benefits of inquiry into one subject and expect the state's questioning within the same scope to be held impermissible." *State* v. *Brown*, 131 Conn. App. 275, 287–88, 26 A.3d 674 (2011), aff'd, 309 Conn. 469, 72 A.3d 48 (2013); see also *State* v. *Place*, 153 Conn. App. 165, 184, 100 A.3d 941, cert. denied, 314 Conn. 946, 103 A.3d 977 (2014) (same).

To the extent that the defendant currently argues that the court's ruling was improper because it was unfairly prejudicial to the defense, we observe that once the court permitted the inquiry at issue, the state did not delve into a lengthy examination of Chase or make a second attempt to introduce Chase's written inventory of the automobile. Rather, the prosecutor's brief inquiry of Chase during redirect examination elicited additional testimony related to the inventory that was necessary to provide the jury with a complete picture of what items Chase discovered during his examination of the automobile. Defense counsel did not conduct any further examination of Chase with respect to this issue.

Thus, we are not persuaded that the state exceeded the questioning that was necessary to remove the unfair prejudice that was caused by defense counsel's inquiry. Relying largely on the reasons cited by the court in its initial ruling on the admissibility of the evidence at issue, the defendant argues for the first time on appeal that its subsequent ruling was unduly prejudicial to the defense. As we have previously observed, in admitting evidence pursuant to the opening the door doctrine, the court has the discretion of admitting evidence that ordinarily would be inadmissible on other grounds. The defendant has not demonstrated that the prejudice suffered by the defense as a result of the court's ruling was greater than the prejudice that would have been suffered by the state absent the permitted inquiry.

Even if we were to conclude that the court abused its discretion in admitting the evidence at issue, the defendant is unable to obtain relief because he has failed to demonstrate that the admission of the evidence affected the jury's verdict. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper

standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict.'' (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 133, 156 A.3d 506 (2017).

The defendant's harmlessness analysis follows his belief that Chase's testimony concerning the discovery of the beverage in the cup was the only testimony regarding alcohol. This, however, is not an accurate description of the evidence. Kibby described the defendant's conduct at the traffic intersection as well as his incapacity. Gosselin provided ample testimony with respect to several matters, including his observations of the defendant, the sweet smell inside of the defendant's automobile, the defendant's inability to complete three standard field sobriety tests, and his belief that the defendant was intoxicated. Importantly, Gosselin testified that, when he asked the defendant if he had consumed any alcohol, the defendant replied that he had and stated that he was tired. Chase testified with respect to his observations of the defendant on the night in question. The descriptions provided by Gosselin and Chase strongly supported a finding of alcohol consumption. Moreover, there was other evidence that supported a finding that the defendant had consumed alcohol. This included dashboard camera recordings from Gosselin's police cruiser that depicted the defendant's movements during his encounter with Gosselin, as well as his conduct and speech during his transport to the police headquarters. These recordings, which depicted the defendant's unsteadiness and his slurred speech, were strong evidence of alcohol intoxication. Also, the jury heard the parties' stipulation that the defendant had refused to submit to a breath test.

As we already have concluded in part I of this opinion, on the basis of our consideration of the evidence in its totality, the state presented a strong case that the defendant was intoxicated. Although Chase's testimony concerning the beverage in the cup was not cumulative of other evidence of a similar nature, it certainly was cumulative evidence of the defendant's alcohol consumption. Moreover, despite the fact that, during closing arguments, defense counsel argued before the jury that the evidence merely had reflected that the defendant was suffering from a diabetic coma during the incident in question, the defendant did not contradict the state's evidence in any compelling way. Defense counsel had an opportunity to cross-examine Chase with respect to the basis of his belief that the beverage that he discarded contained alcohol, yet defense counsel did not conduct any subsequent cross-examination of Chase after the prosecutor had elicited the testimony at issue during the state's redirect examination. In light

of all of the evidence, we are not persuaded that Chase's testimony concerning the beverage in the cup substantially swayed the verdict.[7] Thus, the defendant has not demonstrated that the ruling was harmful.[8]

## III

Last, the defendant argues that the court infringed on his right to testify. We disagree.

The following additional facts are relevant to the present claim. On February 20, 2015, the court held a charge conference with counsel. At this juncture in the trial, the state had concluded its direct examination of its final witness, Gosselin, but had not yet rested its case-in-chief. The defense had not yet had an opportunity to cross-examine Gosselin. Defense counsel stated that the defendant had waived his right to be present at the charge conference. In reviewing its draft jury charge with counsel, the court stated that it would list the witnesses who testified on behalf of the state because it did not believe that the defense intended to present any testimony. The court stated: "[J]ust so you're aware, I am basing this [decision] on the defendant's [wishes] thus far, and obviously, he has the ability to change his mind if he wishes to, that there is not going to be any evidence presented in the defendant's case-in-chief." The court informed counsel that if the defendant elected to present evidence, it would modify its charge accordingly. Defense counsel replied, "[f]ine."

During the charge conference, the court referred to previous comments that it had made to the defendant concerning his right to testify.[9] The court stated: "As I told [the defendant] before he left [on the preceding day of trial] . . . one of the reasons he should be here [today], it's his choice if he wants to waive [his presence], is that I will tell the difference between the instruction concerning the defendant's testifying and the defendant not testifying. Again, thus far, and I know it could change. [Defense counsel] has indicated [that] the defendant is not going to testify, so I'm going to eliminate [from the draft charge] the defendant's testimony instruction and include [an instruction pertaining to the fact that] the defendant did not testify."

The following colloquy occurred:

"[Defense Counsel]: It remains the intention of the defense not to have [the defendant] testify.

"The Court: But I understand that if things change— if [the defendant] walks in Monday and says, I want to testify—

"[Defense Counsel]: Yeah, yeah. Understood.

"The Court: —either way, so.

"[Defense Counsel]: And I actually asked [the defendant], just for the record, I did ask him to come a couple

of minutes early, if that would help the court to canvass prior to the beginning of the case.”

The next day of trial was Monday, February 23, 2015. When the proceeding began, the court addressed the defendant with respect to his decision not to be present at the charge conference that had taken place on the previous Friday, February 20, 2015. The defendant stated that he had waived his right to be present because he was unable to take time off from work. After the court addressed other matters relating to its draft jury charge, it addressed the defendant with respect to the issue of whether he would testify. The court stated: “[T]his is something that was indicated to the court when you weren’t here on Friday . . . so let me explain to you what it is. Is that . . . and obviously it’s not final until [defense counsel] puts it on the record, but in an effort to take advantage of some time that we have, as well as making sure that you understand what’s occurring, [defense counsel] on Friday indicated that once the cross-examination of . . . Gosselin is complete, it’s the court’s understanding and, again, this is—he told me on Friday that the state will rest, which means the state’s through with [its] case-in-chief. Then the defendant has the opportunity, but is not required—you heard me say—instruct the law to put on evidence and [defense counsel] has indicated that there—he is not intending to put on any evidence. He has, also—which is fine, that’s your choice. He did, also, indicate that he anticipates that you will not take the witness stand, and I don’t know if that’s a final decision or not, but I wanted to canvass you on that decision if you—if [defense counsel] stands up—I was going to ask him in a—if [defense counsel] stands up and says rest without putting on evidence in front of the jury, I want to make sure that we’ve covered this area, okay? So, I just want to make sure, because it is a constitutional right to testify or not testify; it’s your choice. But I just want to canvass you, if you will, ask you some questions, making sure it’s an act of your own free will, okay?”

During the court’s canvass, the defendant revealed his date of birth, stated that he had graduated from college, and stated that he was able to understand English. The following colloquy then occurred:

“The Court: [W]ithin the last twenty-four to forty-eight hours, have you taken any medication, drugs, alcohol, or anything that would affect your ability to hear me, to think, to comprehend, to understand?

“The Defendant: No.

“The Court: Now, have you had a full opportunity to discuss with [defense counsel], your attorney, the decision-making process and your decision to testify or not testify in this case?

“The Defendant: Yes, I have.

“The Court: Okay, and I’m not interested in what the

content of the discussion is, I'm only interested in . . . if you've had that opportunity to discuss with him that issue?

"The Defendant: Yes, I have.

"The Court: Okay, and he has answered any questions that you have had or continue to have concerning those?

"The Defendant: Yes.

"The Court: Do you need any more time to discuss with [defense counsel] the decision to testify or not to testify in this case?

"The Defendant: No.

"The Court: Okay, have you made a decision not to testify in this case?

"The Defendant: That's correct.

"The Court: Okay, is anyone forcing you or threatening you, in any way, to do that?

"The Defendant: No, sir.

"The Court: It's an act of your own free will or voluntary act?

"The Defendant: Yes, Your Honor.

"The Court: I want you to understand that if you do not testify in this case, I will instruct the jury as follows; the defendant has not testified in this case. An accused person has the option to testify or not to testify at the trial. He is under no obligation to testify. He has a constitutional right not to testify. You must draw no unfavorable inferences from the defendant's decision not to testify. Do you understand that?

"The Defendant: Yes.

"The Court: If you were to testify . . . the instruction would be more geared to that [the jury] should not hold it against you because you are the defendant. They should treat you like any other witness. But . . . the important one is . . . this one because you have made that decision. Do you have any questions concerning it?

"The Defendant: No.

"The Court: Do you need any more time to talk to [defense counsel] about your decision not to testify?

"The Defendant: No.

"The Court: Okay, do you have any questions that you wish to ask me?

"The Defendant: Not at this time.

"The Court: Okay, thank you. Have I covered— [defense counsel]?

"[Defense Counsel]: Yes, Your Honor.

"The Court: Okay, thank you, sir. I think we've gotten everything that we need to cover."

Following the canvass, the jury was summoned to the courtroom, and defense counsel conducted his cross-examination of Gosselin. The prosecutor conducted a brief redirect examination of Gosselin. Then, the state rested its case-in-chief. Defense counsel moved for a judgment of acquittal. As we explained previously in this opinion, the court granted the motion in part with respect to the allegation of drug use. After a brief recess, which was requested by defense counsel, the defense rested. Then, defense counsel renewed his motion for a judgment of acquittal, which the court denied. At no time following the court's canvass did the court revisit the issue of the defendant's expressed decision not to testify, nor did the defendant bring any concerns or questions to the court's attention related to the subject of his testifying.

For the first time, on appeal, the defendant claims that the court infringed on his right to testify. The defendant argues that the court prematurely forced him to make a decision with respect to his right not to testify by canvassing him prior to the conclusion of the state's case-in-chief. According to the defendant, "[t]his unconditional right should only be exercised after all of the evidence has been presented, not before the state has even presented its case in its entirety. The current status of the law does not insure that the waiver of the right to testify is truly knowing and intelligent and voluntary." Additionally, the defendant argues that any waiver that occurred was deficient because it was unclear whether he understood that he could overrule his counsel's advice with respect to testifying. Moreover, the defendant argues that the court's alleged untimely canvass left him "no choice" but to answer the court's inquiries and that he may have believed the subject could not be raised again at a later time. He also argues that the lack of any further inquiries by the court about his decision not to testify unnecessarily "chill[ed]" his free exercise of his right.

The defendant requests review of his unpreserved claim under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). As modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), the *Golding* doctrine provides that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond

to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40. "The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. . . . The defendant also bears the responsibility of demonstrating that his claim is indeed a violation of a fundamental constitutional right. . . . Finally, if we are persuaded that the merits of the defendant's claim should be addressed, we will review it and arrive at a conclusion as to whether the alleged constitutional violation . . . exists and whether it . . . deprived the defendant of a fair trial." (Citations omitted.) Id., 240–41.

The record is adequate to review the defendant's claim, and it implicates the defendant's constitutionally protected right to testify on his own behalf. See *Rock* v. *Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); *State* v. *Ayala*, 324 Conn. 571, 600–601, 153 A.3d 588 (2017). The claim, however, fails under *Golding*'s third prong.

The state argues, and we agree, that any claim directly related to the timing of the court's canvass was waived by defense counsel by virtue of his representations to the court concerning the timing of the canvass. As we have set forth previously, defense counsel did not merely acquiesce in the timing of the court's canvass, but represented to the court that he had asked the defendant to come to court early on Monday, February 23, 2015, so that the court could canvass him "prior to the beginning of the case" that day. Although the defendant argues that this statement did not reflect that defense counsel agreed with a canvass occurring "at the very start of the proceedings on Monday and prior to the close of the state's case," such an interpretation is not reasonable. Defense counsel made the statement at issue prior to the close of the state's case-in-chief, which was scheduled to resume on Monday. Defense counsel's statement that the canvass could take place "prior to the beginning of the case" on Monday reasonably implied that it was appropriate for the canvass to take place before the jury was expected to be present in court on Monday to resume hearing evidence in the state's case-in-chief. It is well settled that "a valid waiver calls into question the existence of a constitutional violation depriving the defendant of a fair trial for the purpose of *Golding* review . . . ." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70, 967 A.2d 41 (2009); see also *State* v. *McDaniel*, 104 Conn. App. 627, 632–35, 934 A.2d 847 (2007) (valid waiver thwarts relief under *Golding*'s third prong), cert. denied, 285 Conn. 912, 943 A.2d 471 (2008).

Alternatively, with respect to either the timing or the substance of the court's canvass generally, we conclude that the defendant is unable to demonstrate that a con-

stitutional violation exists because he did not represent at trial that he either wanted to testify or did not know that he could testify. Our Supreme Court has held that, in such a situation, the trial court is under no affirmative duty to conduct a canvass to determine if a defendant's waiver of the right to testify is knowing, voluntary, and intelligent. See *State* v. *Paradise*, 213 Conn. 388, 405, 567 A.2d 1221 (1990), overruled in part on other grounds by *State* v. *Skakel*, 276 Conn. 633, 693, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).[10] "In *Paradise*, our Supreme Court held that the substantive right to testify under federal constitutional law does not contain a corollary procedural requirement that a trial court canvass a defendant concerning his waiver of his right to testify unless the defendant affirmatively states that he wishes to testify or that he did not know he could testify." *State* v. *Burgos*, 170 Conn. App. 501, 515, 155 A.3d 246, cert. denied, 325 Conn. 907, 156 A.3d 538 (2017). It is not in dispute that, before the trial court, the defendant did not affirmatively state that he wanted to testify or that he did not know that he could testify. In these circumstances, the defendant is unable to demonstrate that the court had a duty to canvass the defendant with respect to his right to testify at trial. Accordingly, the defendant is unable to demonstrate that a constitutional violation exists.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court sentenced the defendant to a two year term of incarceration, execution suspended following one year (120 days mandatory minimum), followed by three years of probation.

[2] Gosselin testified that the defendant "just continued to plead with us not to do anything." Chase testified that the defendant "was pleading throughout the [field sobriety testing] that he receive a break and that we not arrest him."

[3] At trial, the parties stipulated to this fact.

[4] The defendant argues that "there was no evidence of slurred speech" in this case. The video taken inside of Gosselin's police cruiser, which recorded the defendant's statements to Gosselin during his transport to police headquarters, supported a finding that the defendant was slurring his speech following his arrest. Such a subordinate finding, of course, further supported a finding that the defendant was intoxicated.

[5] "In any criminal prosecution for a violation of subsection (a) of this section, evidence that the defendant refused to submit to a blood, breath or urine test requested in accordance with section 14-227b shall be admissible provided the requirements of subsection (b) of said section have been satisfied. If a case involving a violation of subsection (a) of this section is tried to a jury, the court shall instruct the jury as to any inference that may or may not be drawn from the defendant's refusal to submit to a blood, breath or urine test." General Statutes § 14-227a (e).

[6] The exhibit is entitled "BERLIN POLICE DEPARTMENT POSSESSED VEHICLE INVENTORY." In the portion of the form for "Inventory for Contents" in "Glove Compartment or Console," the following is handwritten: "drink w/ice in center console."

[7] As part of his analysis of harm, the defendant argues that "the prejudicial impact" of Chase's testimony was reflected in the fact that, during its deliberations, the jury asked to rehear that portion of Gosselin's testimony in which he asked the defendant about his alcohol consumption. The defendant has not articulated why this jury note, which did not pertain to the evidence that is the subject of the present claim, reflected harm connected to the admission of the evidence that is the subject of the present claim.

[8] The defendant does not argue that the claimed error is constitutional in nature, yet asserts that it is the state's burden to demonstrate that the court's error in admitting Chase's testimony was harmless. To obtain relief, it is the defendant's burden to prove that evidentiary error of a nonconstitutional nature is harmful in that it substantially swayed the jury in reaching its verdict. See, e.g., *State* v. *Edwards*, supra, 325 Conn. 133.

[9] According to the court, its prior comments addressed to the defendant were not reflected in the transcript of the February 19, 2015 proceeding as a result of a malfunction of the court monitor's equipment late that day. For the purpose of preserving a record of that brief portion of the proceeding, during which no evidence had been presented, the court summarized what had transpired and invited counsel to add anything to the record that it might have overlooked.

[10] In his principal brief and his reply brief, the defendant acknowledges *Paradise*, yet argues that this court should revisit the issue of "whether a defendant should be canvassed on the record in regard to his/her right to testify." We decline to do so. "[I]t is well established that this court, as an intermediate appellate tribunal, is not at liberty to discard, modify, reconsider, reevaluate or overrule the precedent of our Supreme Court." (Internal quotation marks omitted.) *State* v. *Petitt*, 178 Conn. App. 443, 457, 175 A.3d 1274 (2017), cert. denied, 327 Conn. 1002, 176 A.3d 1195 (2018).

───────────────────