******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* SHIFE TRICE
### (AC 46683)

Elgo, Moll and Eveleigh, Js.

*Syllabus*

Convicted, following a bench trial, of the crime of robbery in the second degree, the defendant appealed. He claimed, inter alia, that the trial court improperly failed to conduct an independent inquiry into his competence to understand the proceedings and to assist his counsel in his defense. *Held*:

The trial court did not abuse its discretion in declining to conduct a competency hearing, as the court's observations of the defendant did not lead it to believe that his conduct rose to the level of substantial evidence of mental impairment and, thus, the defendant's unpreserved claim that the trial court's failure to conduct a competency hearing violated his due process right to a fair trial failed under the third prong of *State* v. *Golding* (213 Conn. 233).

The evidence was sufficient to support the defendant's conviction, as the trial court found, beyond a reasonable doubt, that the defendant intended to steal the victim's car and represented to the victim that he had a deadly weapon or a dangerous instrument, which he put to the back of the victim's head and threatened to use if the victim did not comply with his order to get on the ground.

The trial court did not, as the defendant claimed, clearly and conclusively deny him his constitutional right to represent himself during a pretrial hearing, the court having instead continued the hearing to resolve its concern about his competence, and the defendant thereafter waived his right to self-representation when, after his counsel withdrew, he acquiesced to being represented by a different attorney and did not reassert his request to represent himself, and the defendant's contention that the court's alleged error was structural, thereby requiring the reversal of his conviction, did not contradict this court's conclusion that he waived his right to represent himself.

The trial court did not abuse its discretion when it properly determined that defense counsel opened the door to the admission of hearsay testimony from a police officer regarding an out-of-court statement by the victim describing the robbery suspects, as defense counsel's implication on cross-examination of the officer that the police did not have an adequate description of the robber could have left the court, as the fact finder, with the false impression that the police did not have a more specific description of the robber, and the officer's testimony served to remove any unfair prejudice that might have otherwise ensued from defense counsel's inquiry.

Argued March 13—officially released September 16, 2025

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of robbery in the second degree and conspiracy to commit robbery in the second degree, and, in the second part, with being a persistent felony offender, brought to the Superior Court in the judicial district of Hartford, where the court, *Baldini, J.*, denied the defendant's motion for new counsel; thereafter, the court, *K. Doyle, J.*, granted the motion to withdraw filed by the defendant's counsel; subsequently, the first part of the information was tried to the court, *Schuman, J.*; thereafter, the court, *Schuman, J.*, denied the defendant's motion for a judgment of acquittal; finding of guilty of robbery in the second degree; subsequently, the defendant was presented to the court, *Schuman, J.*, on a plea of guilty to the second part of the information; judgment of guilty in accordance with the finding and the plea, from which the defendant appealed to this court. *Affirmed.*

*Abigail H. Mason*, assigned counsel, for the appellant (defendant).

*Alexander A. Kambanis*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Robert Diaz*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Shife Trice, appeals from the judgment of conviction, rendered after a trial to the court, of robbery in the second degree in violation of General Statutes § 53a-135 (a) (1) (B). On appeal, the defendant claims that (1) the court improperly failed to conduct, sua sponte, an independent inquiry into his competence, (2) there was insufficient evidence presented at trial to support his conviction, (3) the court violated his constitutional right to self-representation,

and (4) the court abused its discretion by admitting a certain hearsay statement into evidence. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the trial court reasonably could have found, and procedural history are relevant to the resolution of this appeal. On September 30, 2020, at approximately 3:48 a.m., the victim, Anthony West, parked his car in a parking lot on Sigourney Street in Hartford, down the street from his apartment. As the victim was exiting his car, the defendant approached him, put a facsimile firearm to the back of his head, and told him to get on the ground. The victim could feel that the object was metal and that it felt like a gun. The victim was scared that he was going to get killed, so he complied with the defendant's commands and laid on the ground. He left his phone, wallet, and keys in the car. The defendant and V,[1] a juvenile who was with the defendant, "jumped in [the car] and took off."

The victim went to a neighbor's house and used the neighbor's phone to call 911. Officer Steven McCullough of the Hartford Police Department responded to the victim's location on Sigourney Street. The victim told McCullough that two individuals were involved, but he could not identify them. The victim provided a general description of both individuals to McCullough, including that they were both males wearing hoods and medical masks.

Meanwhile, Officer Nathan McOuat of the Hartford Police Department drove around the area looking for the victim's car. At 3:59 a.m., approximately ten or eleven minutes after the officers had received the victim's call, McOuat located the victim's car on Sargeant Street, which was two or three blocks away from the victim's location on Sigourney Street. McOuat angled

---

[1] Because V was a juvenile at the time of his involvement in this incident, we decline to identify him by his full name.

his police cruiser in front of the victim's car, which was parked on the curb line of the road. Because a weapon reportedly was used when the car was taken, McOuat waited, with his gun drawn and pointed at the car, until other officers could arrive to assist him. As McOuat gave verbal commands to the occupants of the vehicle, he could hear the engine of the car revving.

McCullough left the victim's location to assist McOuat. The defendant, who was in the driver's seat of the victim's car, complied with McCullough's order to exit the car. McCullough patted the defendant down and found a facsimile firearm and the victim's wallet inside the defendant's pockets. V, who had been in the front passenger seat, was found with a backpack containing two large knives with steel blades. McCullough observed that both the defendant and V were wearing dark-colored, hooded sweatshirts and medical masks, and that V was wearing gloves.

The defendant was arrested and charged in a substitute information with robbery in the second degree in violation of § 53a-135 (a) (1) (B), and conspiracy to commit robbery in the second degree in violation of § 53a-135 (a) (1) (B) and General Statutes § 53a-48 (a). The defendant waived his right to a jury trial and elected a trial to the court. The trial took place over the course of five days in January and February, 2023. The court, *Schuman, J.*, found the defendant guilty of robbery in the second degree and not guilty of conspiracy to commit robbery in the second degree. Thereafter, the defendant pleaded guilty to being a persistent felony offender pursuant to General Statutes § 53a-40 (g), which the state had charged in a separate part B information, and the court rendered judgment accordingly, imposing a total effective sentence of ten years of incarceration followed by five years of special parole. This appeal followed.

## I

We first address the defendant's claim that the trial court improperly failed to conduct, sua sponte, an independent inquiry into his competence. The defendant acknowledges that his claim is unpreserved and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

The state concedes that the defendant has met the first two *Golding* prongs in that the record is adequate to permit review and that his claim is of constitutional magnitude. We therefore proceed to a consideration of the third prong, namely, whether the alleged constitutional violation exists and deprived the defendant of a fair trial. See, e.g., *State* v. *Paulino*, 127 Conn. App. 51, 61, 12 A.3d 628 (2011). We conclude that the defendant has not satisfied the third prong of *Golding*.

The following additional facts and procedural history are relevant to our resolution of this claim. At a pretrial hearing on April 8, 2021, the court, *Baldini, J.*, addressed a plea offer that had been extended by the state, pursuant to which the defendant would receive

a total effective sentence of eight years of incarceration followed by five years of special parole if he pleaded guilty to charges of robbery in the first degree and conspiracy to commit robbery in the first degree. The state had charged the defendant with these offenses in a substitute information filed on March 11, 2021.[2]

Discussion ensued between the trial court and the defendant after he indicated that he wanted to reject the offer, fire his attorney, Dennis P. McMahon, and represent himself.[3] During these discussions, the defendant asked the court about the charges against him. The following colloquy occurred:

"[The Defendant]: . . . May I please get acknowledgment about my alleged criminal offenses I'm being charged with right now?

"The Court: I'm not really sure . . . what you mean. I just told you that the state has charged you with robbery in the first degree and conspiracy to commit robbery in the first degree.

"[The Defendant]: So, I'm being charged with that right now?

"The Court: Yes. So, it sounds like . . . there's also some other stuff. So, this is what we're going to do, sir. I'm going to continue your case to allow you to have another conversation with your attorney, and then I'm also going to just make sure . . . I'm going to ask Attorney McMahon in those subsequent conversations that I anticipate you're having, if there's any conversations that you have that lead you to think that maybe this defendant doesn't understand the proceedings against

---

[2] The substitute information that was the operative information at the time of the defendant's trial, charging him with robbery in the second degree and conspiracy to commit robbery in the second degree, was not filed until January 24, 2023.

[3] These discussions are addressed in further detail in part III of this opinion.

him or assisting in his defense that you'll bring that to the court's attention. It's not apparent to me at this point, but it could be something that might require further discussion in the future, okay."

McMahon agreed to proceed in the manner outlined by the court; however, the defendant responded: "But I don't understand what I'm being charged with right now." The defendant listed the statutory provisions that the state had alleged he violated in the original information and stated his belief that he had not been charged with robbery in the first degree.[4] He also stated that he did not understand how he could be charged with robbery in the first degree if he did not "reach the criteria" of that offense.

The court responded: "[W]e're going to move this to May [13, 2021] at 10:30 [a.m.]. And so, what I want is to make sure we have some clarity on . . . it seems like you have some questions with regard to the charges. And I'm going to give you a chance to speak with Attorney McMahon because it sounds like, from the questions you're asking, that that is necessary." The defendant again expressed that he did not understand how he was being charged with robbery in the first degree given the offenses that he had been charged with in the original information. The following colloquy then ensued:

"The Court: Okay. So, we're going to have an opportunity for you to speak with your attorney. At this point,

---

[4] In the original information, filed on October 1, 2020, the state charged the defendant with violating General Statutes § 53a-136a, which the information described as "robbery by carjacking"; carrying a dangerous weapon in violation of General Statutes § 53-206; and risk of injury to a child in violation of General Statutes § 53-21. Notably, § 53a-136a is not a separate crime but, rather, a sentence enhancement provision for a robbery of an occupied motor vehicle. See *State* v. *Edwards*, 100 Conn. App. 565, 596–97, 918 A.2d 1008, cert. denied, 282 Conn. 928, 926 A.2d 666 (2007), and cert. denied, 282 Conn. 929, 926 A.2d 667 (2007); see also *State* v. *Orlando F.*, 233 Conn. App. 1, 9 n.10, 338 A.3d 379, cert. denied,      Conn.    ,     A.3d     (2025).

we're not focused on what we had intended to do today. There are some issues that have come up. Certainly, we can discuss them further on May 13th. The state can change the charges to substitute an information, okay. And that was what I understood to be part of the plea agreement. If the plea agreement is something that the defendant doesn't wish, the state can proceed on the initially filed charges. So, that is something that we'll discuss on that May 13th date at 10:30 a.m. Okay?

"[The Defendant]: Will you please say that again? So, the state can change the charges at any given time.

"The Court: Well, what we intended to do, from what I understand, is, there was a plea agreement. The state made an offer to resolve your case. And the offer contemplated pleas to the charges that I mentioned. So, since you're not making a decision today, we don't have to address that issue. So, Attorney McMahon, you can talk to [the prosecutor] about what the intended charges are, what the plea agreement is. You can have a conversation with your client. We'll go back on the record on May 13th at 10:30 a.m."

At the hearing on May 13, 2021, the trial court permitted the defendant to read a written statement he had prepared, in which he challenged the state's ability to charge him with robbery in the first degree by way of its substitute information. Specifically, the defendant argued: "The prosecutor is illegally subject to on my original accused criminal offense of [General Statutes §] 53a-136a and [General Statutes §] 53-206 and . . . [General Statutes § 53-21] to new criminal offenses of [§] 53a-134 (a), robbery, first degree, firearm threatening, [§] 53a-134 (a) (4), conspiracy to commit robbery, first degree, firearm threat. That clearly deprives me of my due process cause under the fourteenth amendment and the federal constitution and violates my Supreme Court and Appellate Court laws of Connecticut. I refer

to case law [*State* v. *Dash*, 242 Conn. 143, 150, 698 A.2d 297 (1997)] and [*State* v. *Edwards*, 100 Conn. App. 565, 568, 918 A.2d 1008, cert. denied, 282 Conn. 928, 926 A.2d 666 (2007), and cert. denied, 282 Conn. 929, 926 A.2d 667 (2007)]. Both case law specifically indicate [§] 53a-136a is not a separate offense or shall be imposed as a prosecution as a separate offense or replaced as a separate criminal offense because this statutory section is a sentence enhancement provision rather than a separate offense, and the purpose of [§] 53a-136a . . . is not to create a separate offense or to impose criminal liability on the legislature fail to do so. So, with that being said, Your Honor, I'd like for you to look into that, if you can, on recess or something like that and back to me as soon as possible. Thank you for your time."

The trial court responded: "Okay. Thank you. So, I certainly, when somebody cites case law, I want to make sure that I understand what's being argued. So, at this point, I've listened to the cases that you've cited and the things that you said, and I'm concerned that maybe there might be some issues that would prevent you from understanding what's happening here or your ability to assist in your defense, but I'm not sure. I don't know whether Attorney McMahon has anything that he wants to weigh in at this time, but I do want to respond to what you were saying, Mr. Trice. But before I do, I want to hear from your attorney."

McMahon responded: "Yeah, Your Honor, I don't share that position. I just think he's against the offer. That's how I feel." The court then explained to the defendant that one of the cases he had cited in support of his argument involved a statutory provision with which the defendant was not being charged. No other concerns were raised regarding the defendant's competence throughout the remaining pretrial proceedings or at trial.

The following legal principles guide our analysis of this claim. "Because the conviction of an accused person while he is legally incompetent violates due process; *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); a trial court must be vigilant to the possibility that a competency evaluation may be required in the case of a defendant who . . . engages in conduct during the trial [or pretrial proceedings] that calls his competency into question." (Internal quotation marks omitted.) *State* v. *Connor*, 292 Conn. 483, 522–23, 973 A.2d 627 (2009). "[General Statutes §] 54-56d establishes the procedural requirements for competency determinations. A court may undertake a competency examination upon a motion by the defendant or the state and in some circumstances must evaluate the defendant's competency sua sponte." *State* v. *Johnson*, 253 Conn. 1, 22, 751 A.2d 298 (2000); see also General Statutes § 54-56d (c) ("[i]f, at any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency"). Pursuant to § 54-56d (a), "a defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense."

"[A]s a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever [the court becomes aware of] substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court. . . . Evidence is substantial if it raises a reasonable doubt about the defendant's competency." (Internal quotation marks omitted.) *State* v. *Connor*, supra, 292 Conn. 523. "In determining whether a defendant's competence has been sufficiently called into doubt so as to necessitate a hearing on the matter, the United States

Supreme Court has cautioned that there is no single approach or factor that is most important in establishing competency or lack thereof. . . . [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts." (Citation omitted; internal quotation marks omitted.) *State* v. *Dort*, 315 Conn. 151, 163, 106 A.3d 277 (2014).

We review the trial court's determination of whether to conduct an inquiry into the defendant's competence under the abuse of discretion standard. *State* v. *Paulino*, supra, 127 Conn. App. 61. We note that the trial judge "is in a particularly advantageous position to observe a defendant's conduct during a trial and has a unique opportunity to assess a defendant's competency. A trial court's opinion, therefore, of the competency of a defendant is highly significant." (Internal quotation marks omitted.) *State* v. *Connor*, supra, 292 Conn. 523–24. In addition, although a defendant whose competence has been challenged may not be personally canvassed through the questioning of his or her attorney; *State* v. *Dort*, supra, 315 Conn. 182; "a trial court is entitled to consider trial counsel's assertions that his client is competent." *State* v. *Paulino*, supra, 65.

On appeal, the defendant cites several instances during the pretrial proceedings that he claims should have prompted the trial court to order a competency hearing: (1) he "interject[ed] in court consistently after his first

appearance, making requests for a speedy trial and claiming to have problems with his attorney"; (2) he filed motions on his own behalf despite being represented by counsel; (3) he "raise[d] the problem that he [did] not understand what the charges [were] against him at each court date leading up to his waiver of the jury trial"; and (4) he stated that he did not understand the prosecutor's ability to amend the charges against him. The defendant contends that, because the trial court did not conduct an inquiry into his competence, he involuntarily and unknowingly rejected multiple plea offers, pleaded not guilty, waived his right to a jury trial, and chose to testify.[5] We disagree.

Although the trial court expressed some initial concern regarding the defendant's competence, it is apparent from our review of the record that the court did not believe that the defendant's conduct rose to the level of substantial evidence of mental impairment. At the pretrial hearing on April 8, 2021, after the defendant questioned what he was being charged with, the court asked McMahon to bring to the court's attention any concerns he had about whether the defendant understood the proceedings or was able to assist in his defense. In doing so, however, the court stated: "*It's not apparent to me at this point*, but it could be something that *might* require further discussion in the future,

---

[5] As noted in part III of this opinion, the state made two separate plea offers to the defendant: (1) an offer discussed at hearings on April 8, May 13 and June 24, 2021, under which he would receive a sentence of eight years of incarceration followed by five years of special parole if he pleaded guilty to the charges of robbery in the first degree and conspiracy to commit robbery in the first degree; and (2) an offer discussed at a hearing on September 2, 2022, under which he would receive a sentence of five years of incarceration followed by ten years of special parole if he pleaded guilty to larceny in the first degree.

The defendant waived his right to a jury trial on November 9, 2022, after the court, *Gold*, *J.*, canvassed him to ensure that he was knowingly, voluntarily, and intelligently waiving that right. The defendant also was canvassed by the court, *Schuman*, *J.*, on his decision to testify immediately before taking the witness stand on January 25, 2023.

okay." (Emphasis added.) Similarly, at the hearing on May 13, 2021, after the defendant argued that the state's filing of a substitute information violated his right to due process, the court stated in relevant part: "I'm concerned that *maybe* there *might* be some issues that would prevent you from understanding what's happening here or your ability to assist in your defense, *but I'm not sure.*" (Emphasis added.) While the court appropriately expressed its uncertainty, the court's observations of the defendant's conduct did not sufficiently call into doubt the defendant's competence so as to necessitate a hearing on the matter.

Moreover, the trial court's initial concern subsequently was dispelled by McMahon's assertion that he did not "share that position" regarding the court's uncertainty about the defendant's competence and that he believed the defendant was "just . . . against the offer." The court reasonably took McMahon's opinion into account. See *State* v. *Paulino*, supra, 127 Conn. App. 65 ("a trial court is entitled to consider trial counsel's assertions that his client is competent"); see also *State* v. *Burgos*, 170 Conn. App. 501, 530, 155 A.3d 246 ("a failure by defense counsel to indicate that the defendant had any difficulty in comprehending the nature of the proceedings or in assisting in his own defense provides substantial evidence of the defendant's competence"), cert. denied, 325 Conn. 907, 156 A.3d 538 (2017).

In addition, our review of the record reflects that the defendant's proclaimed misunderstanding of the charges against him was not indicative of diminished mental capacity but, rather, related to his disagreement with the state's ability to file different charges against him in a substitute information. Further, the defendant's opposition to the state's filing of a substitute information was based on an apparent misunderstanding of the law. "[A] lack of legal expertise is not indicative of incompetence." *State* v. *Paulino*, supra, 127 Conn. App.

66; see also *State* v. *Connor*, supra, 292 Conn. 524 (court was not required to order competency evaluation where "conduct reflect[ed] more on the defendant's lack of legal experience and expertise than it [did] on his mental condition"); *State* v. *Jeremy D.*, 149 Conn. App. 583, 591, 90 A.3d 979 ("a lack of understanding or mere confusion concerning criminal proceedings does not amount to mental incompetence"), cert. denied, 312 Conn. 913, 93 A.3d 596 (2014). Similarly, many of the defendant's interjections in court throughout the pretrial proceedings, including his repeated requests for a speedy trial and his filing of motions on his own behalf, appear from the record to be based on his dissatisfaction with McMahon; see part III of this opinion; rather than reflecting evidence of mental impairment.

Finally, the defendant's behavior must be viewed in light of the other parts of the record that reflect his ability to follow court rules and procedures during the remainder of the trial. See *State* v. *Connor*, supra, 292 Conn. 524 ("to the extent that [certain] examples of the defendant's conduct might be viewed as suggestive of a diminished mental capacity, they must be considered in the light of other evidence indicating that the defendant was, in fact, competent, including evidence of his ability to follow court rules and procedures and the trial court's directives"). Other parts of the record, including the defendant's own testimony and the comments from both the trial court and the prosecutor, who had the opportunity to view the defendant's behavior in person, reflect that the defendant understood the proceedings and was able to assist in his defense. At the conclusion of trial, after making its guilty finding, the court noted that "[the defendant] has behaved himself very well in court throughout this entire trial and has been very respectful to the court." Similarly, when the prosecutor spoke at the defendant's sentencing, he stated: "I want to put on the record that [the defendant]

as a young man has shown himself to be and has the capability to be a very articulate and well-behaved gentleman. He has been nothing but polite during his entire proceedings. He has actually been polite before the court has come out and engaging in conversations about random things. I say that because he has a lot of potential." Consistent with its earlier observation, the court remarked that "[t]he defendant is an articulate person who has the ability to become a productive citizen. Up until today, when he spoke out of time,[6] he's been very polite and well behaved in court . . . ." (Footnote added.)

Accordingly, we conclude that, in the absence of substantial evidence of mental impairment, the trial court did not abuse its discretion in declining to conduct an independent inquiry into the defendant's competence. Accordingly, the defendant has failed to prove that his constitutional due process right to a fair trial was violated, and his claim fails to meet the third prong of *Golding*.

## II

Next, we address the defendant's claim that the evidence presented at trial was insufficient to support his conviction of robbery in the second degree. We are not persuaded.

We begin by setting forth our standard of review and the relevant legal principles. "When reviewing sufficiency of the evidence claims, this court applies a two part test. . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second,

---

[6] The defendant interrupted the prosecutor's sentencing remarks on a single occasion to object to what he perceived as "false information." After the court explained to the defendant that he needed to object through his attorney and that he would have his own opportunity to speak subsequently in the proceeding, the defendant responded that he understood and he did not interrupt further.

we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . When this inquiry involves circumstantial evidence, [i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt . . . .” (Citations omitted; internal quotation marks omitted.) *State* v. *King*, 350 Conn. 303, 314–15, 324 A.3d 81 (2024). “[W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder’s] verdict of guilty.” (Internal quotation marks omitted.) Id., 315.

“In order for a [fact finder] to find a defendant guilty of robbery in the second degree, it would have to find that in the course of committing a larceny, the defendant used or threatened the immediate use of physical force on another person for the purpose of compelling the owner of such property to deliver up the property and in the course of the commission of the crime or of the immediate flight therefrom displayed or threatened the use of what he represented by his words or conduct to be a deadly weapon or a dangerous instrument.” (Internal quotation marks omitted.) *State* v. *Hall-George*, 203 Conn. App. 219, 227, 247 A.3d 659, cert. denied, 336 Conn. 934, 248 A.3d 709 (2021); see General Statutes § 53a-135 (a) (1) (B).[7]

The following additional facts and procedural history are relevant to this claim. At trial on the first part of

[7] General Statutes § 53a-135 (a) provides in relevant part that “[a] person is guilty of robbery in the second degree when such person (1) commits robbery, as defined in section 53a-133, and . . . (B) in the course of the commission of the crime or of immediate flight therefrom, such person or another participant in the crime displays or threatens the use of what such person represents by such person’s words or conduct to be a deadly weapon or a dangerous instrument . . . .”

the operative information, the state presented testimony from the victim, McCullough, and McOuat. In addition, the state entered into evidence footage from McOuat's body camera (body camera), the facsimile firearm that had been found on the defendant, a map depicting the area of Hartford where the robbery took place and where the victim's car was recovered, and a photograph of the defendant that was taken at the time of his arrest.

At the conclusion of the state's case, defense counsel moved for a judgment of acquittal, which the trial court denied. The defense then presented its case, during which the defendant testified on his own behalf. At the outset, the defendant denied stealing the victim's car. He admitted to being in the driver's seat of the car when he encountered the police and having the facsimile firearm that the officers recovered, but he denied having the victim's wallet on him. According to the defendant's version of events, V had been the one who initially took the car, the defendant had no reason to believe that it was stolen, and V had given him the firearm when they were in the car. After the defendant completed his testimony, the defense rested its case. The defendant subsequently renewed his motion for a judgment of acquittal, which the court again denied.

At the conclusion of trial, the trial court, *Schuman, J.*, found the defendant guilty of robbery in the second degree. In its oral decision, the court made certain factual findings and identified the evidentiary basis for its guilty finding, stating in relevant part: "[T]here's no question that a robbery of the victim . . . occurred. And it was robbery in the second degree because the suspect threatened to use what . . . by his conduct, he represented to be a deadly weapon. The victim felt a . . . metal object that felt like a gun in the back of his head.

"I've examined the gun myself and . . . although it's a facsimile gun, it does have the feel of a real gun. And there was thus, sufficient evidence that the suspect threatened by his conduct . . . to use a deadly weapon. So, the question here, in this trial, was primarily whether it was the defendant who committed the crime. Here is the evidence that I find proves that it was the defendant:

"First and foremost, the defendant is found driving the victim's car only about ten to eleven minutes after the crime within three blocks of the crime. It's true that there was enough time for someone else to steal the car and leave it in the area of where the defendant then entered it and started driving, but this is a most unlikely scenario at 4 a.m. . . . And there is no evidence to support this other theory. Further, the distance traveled by the car, once it is stolen, is a distance that is certainly possible to drive during the ten minutes before it is found . . . before the car is found on the side of the street. Second, even if I don't consider other evidence . . . that tends to describe the suspects, we do know, without dispute, that the victim felt that there were two people involved in a crime. And there were two people, in fact, stopped by the police ten to eleven minutes later. This tends to show that the defendant, because he was with someone else, was one of the robbers and matched at least that minimal description of the suspects. Third, the defendant is found in possession of a metal gun. It turns out to be a facsimile gun. That is consistent with the victim's description of an item, of an object that felt like a firearm. Fourth, and critically, the victim's wallet is found on the defendant's person. We know that because Officer McCullough testified to it, and I have closely examined the [body camera footage] . . . . [T]he video tends to corroborate and support the officer's testimony in court that the wallet was found on the defendant's person.

"So, in sum, the defendant is found driving the victim's car, in the vicinity of the robbery, about ten minutes after the robbery, with another person, as described by the victim, in possession of a metal cap gun, that's consistent with the victim's description of an object that was put in the back of his head, and critically, with the victim's wallet on his person.

"The likelihood that all these events are just a coincidence seems to the court to be . . . infinitesimal and minute. Now, the defendant did testify to a different version of events. And I've considered that. . . . The defendant's testimony as to why he was found in the driver's seat of a stolen car with a gun similar in respect to the object placed in the . . . back of the victim's head was incredible and unbelievable. At times, I also found the defendant's testimony evasive . . . . So, the defendant's testimony did nothing to weaken the state's case. And, in fact, because of its incredulity, tends to strengthen it. In conclusion, I find that the state has proven robbery in the second degree beyond a reasonable doubt. It is true that there is . . . more that the police could have done in this case . . . [b]ut there is sufficient evidence here because of all the circumstantial evidence to prove count one, robbery in the second degree, beyond a reasonable doubt."

On appeal, the defendant contends that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that (1) he intended to commit a larceny, and (2) he used or threatened the immediate use of physical force to carry out the larceny and displayed or threatened the use of what was represented by words or conduct to be a deadly weapon or dangerous instrument. We address each of these arguments in turn.

## A

The defendant first claims that the state failed to establish that he intended to commit a larceny. More

specifically, he argues that "the state did not offer any direct evidence that the defendant was the perpetrator who stole the victim's car in this case," and, therefore, the trial court was "forced to speculate about whether evidence at trial established the defendant's guilt beyond a reasonable doubt." We are not persuaded.

The state presented the following evidence at trial to establish the defendant's identity as the perpetrator who stole the victim's car. McOuat testified that he discovered the victim's vehicle on Sargeant Street, which was in the vicinity of where the robbery took place on Sigourney Street,[8] only ten minutes after the robbery had occurred. McCullough testified that he arrived to assist McOuat shortly thereafter, and both officers testified that they observed the defendant in the driver's seat of the victim's vehicle.

In addition, McCullough testified that he discovered the victim's wallet and a facsimile firearm in the defendant's pockets during a patdown. McOuat testified that he was present when McCullough recovered both of those items, and McOuat's body camera recorded the officers' observations of these items after the patdown had occurred. McCullough described the facsimile firearm as "like a little pistol, a metal pistol," which fit the description of the object that was put to the back of the victim's head during the robbery. During the victim's testimony, he confirmed that the object was metal and that it felt "like a firearm," and he recalled telling officers that it "felt like a gun but not a real gun."

On the basis of the foregoing evidence, the trial court reasonably could have concluded, as it did, that the defendant was the individual who stole the victim's car. In addition, because "[t]he [fact finder] may infer that

[8] McCullough explained that Sargeant Street was two or three blocks away from Sigourney Street, which was consistent with the map that the state had introduced into evidence.

a defendant intended the natural consequences of his actions"; *State* v. *Stephenson*, 207 Conn. App. 154, 180, 263 A.3d 101 (2021), cert. denied, 342 Conn. 912, 272 A.3d 198 (2022); see also, e.g., *State* v. *Papandrea*, 120 Conn. App. 224, 230, 991 A.2d 617 (2010), aff'd, 302 Conn. 340, 26 A.3d 75 (2011); the court reasonably could have inferred that the defendant possessed the requisite intent to find him guilty of robbery in the second degree.

Although the defendant points out the lack of direct evidence of the defendant's identity based on the victim's testimony at trial that he was unable to identify the perpetrator,[9] the cumulative force of the foregoing circumstantial evidence is more than sufficient to fulfill the state's burden of establishing the defendant's guilt beyond a reasonable doubt. "[I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Ramsey*, 352 Conn. 210, 232, 336 A.3d 455 (2025); see also *State* v. *Hinton*, 352 Conn. 183, 194, 336 A.3d 62 (2025) ("[w]e do not draw a distinction between direct and circumstantial evidence so far as probative force is concerned" (internal quotation marks omitted)).

In addition, we reject the defendant's attempt to discount McCullough's testimony that he discovered the victim's wallet on the defendant. The defendant highlights testimony from McCullough that he was unable to recognize the defendant in court on the day of trial[10] and the fact that McCullough did not document in his

---

[9] At trial, the following colloquy took place between the prosecutor and the victim:

"[The Prosecutor]: When that happened, did you . . . were you able to see the individual?

"[The Victim]: No. I could not . . . I can't identify him, so."

[10] When the prosecutor asked McCullough: "Do you see the person in court today . . . who you pulled out of the car," he responded: "Honestly . . . he had his head covered in a mask . . . a medical mask on . . . and it's been three years. I couldn't possibly recall his exact identity."

police report that he found the wallet on the defendant. Regardless of that evidence, however, McCullough specifically testified that he recovered the victim's wallet from one of the defendant's pockets during his patdown of the defendant,[11] and McOuat's testimony and body camera footage corroborated McCullough's version of events. The trial court, as the fact finder in this case, found McCullough's testimony credible, and we will not disturb this credibility determination on appeal. See, e.g., *State* v. *Shin*, 193 Conn. App. 348, 359, 219 A.3d 432 ("[b]ecause it is the sole province of the trier of fact to assess the credibility of witnesses, it is not our role to second-guess such credibility determinations" (internal quotation marks omitted)), cert. denied, 333 Conn. 943, 219 A.3d 374 (2019).

Moreover, to the extent the defendant argues that there was no evidence that he, as opposed to V, had been the perpetrator who stole the victim's car, we disagree.[12] The testimony from McCullough and McOuat established that the defendant—not V—was found in the driver's seat of the victim's stolen car with the victim's wallet and a facsimile firearm in his pockets. Although there was evidence that V was found with a backpack containing two large knives with steel blades,

[11] Specifically, after McCullough testified about finding the facsimile firearm on the defendant, the following colloquy took place between the prosecutor and McCullough:

"[The Prosecutor]: Did you recover anything else on [the defendant]?

"[McCullough]: [The victim's] wallet was in . . . one of his pockets, also.

"[The Prosecutor]: [The victim's] wallet was in [the defendant's] pocket?

"[McCullough]: Yes, sir.

"[The Prosecutor]: How did you know it was [the victim's] wallet?

"[McCullough]: We went to go identify the driver, to find out who he was, and when we opened the wallet, [the victim's identification] was right there, so."

[12] In support of this argument, the defendant references his own testimony that V had stated he was going to ask the victim for a ride and that, a couple of minutes later, V drove up in the victim's car. The court, however, found the defendant's testimony "incredible and unbelievable."

the evidence also demonstrated that the defendant was the one found with a facsimile firearm. The court reasonably found that that firearm—not the knives found with V—fit the victim's description of the object that had been put to the back of his head. At trial, the victim responded in the affirmative when the prosecutor asked if the object felt "like a firearm." In addition, the victim testified: "I recall telling [the officers] that . . . I don't think it was a real gun." Similarly, he responded in the affirmative when the prosecutor asked whether he told the officers that it "felt like a gun but not a real gun." Accordingly, on the basis of this evidence, the trial court reasonably concluded that the defendant, rather than V, was the individual who stole the victim's car.

In addition, although the trial court did not explicitly rely on such evidence in support of its decision, McCullough testified that the victim provided a physical description to differentiate between the two suspects. Specifically, McCullough testified that the victim had "described the one as fat and one as skinny," and "[h]e described the one with the weapon as a . . . fat person."[13] McCullough further testified that, on the basis of his own observations, he would describe V as "slim" and the defendant as "[h]eavier set than [V]."[14] This

---

[13] Although the defendant challenges the propriety of the trial court's admission of McCullough's testimony as to the victim's description of the suspects; see part IV of this opinion; "[e]stablished case law commands us to review claims of evidentiary insufficiency in light of *all* of the evidence [adduced at trial]." (Emphasis added; internal quotation marks omitted.) *State* v. *Waters*, 214 Conn. App. 294, 302, 280 A.3d 601, cert. denied, 345 Conn. 914, 284 A.3d 25 (2022); see also id. ("even improperly admitted evidence may be considered . . . since [c]laims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error" (internal quotation marks omitted)); *State* v. *Ervin B.*, 202 Conn. App. 1, 9 n.6, 243 A.3d 799 (2020) ("[i]n assessing the sufficiency of the evidence . . . we consider *all* evidence admitted at trial" (emphasis in original)).

[14] During his testimony, the defendant acknowledged that V is thinner than he is.

evidence further supports the court's conclusion that the defendant, rather than V, had been the individual who approached the victim, put a firearm to the back of his head, and stole his car.

B

The defendant next argues that the state "did not offer any evidence that the defendant used or threatened the immediate use of physical force, nor displayed or threatened the use of what was represented by words or conduct to be a deadly weapon or dangerous instrument."

Section 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when such person (1) commits robbery, as defined in section 53a-133, and . . . (B) in the course of the commission of the crime or of immediate flight therefrom, such person . . . displays or threatens the use of what such person represents by such person's words or conduct to be a deadly weapon[15] or a dangerous instrument[16] . . . ." (Footnotes added.)

To be convicted of robbery in the second degree, a defendant need not actually have been armed with a deadly weapon or a dangerous instrument. See *State* v. *Hall-George*, supra, 203 Conn. App. 230. Instead, "a defendant need only represent by his words *or* conduct that he is armed with a deadly weapon or dangerous

---

[15] General Statutes § 53a-3 (6) defines "[d]eadly weapon" in relevant part as "any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. . . ."

Although § 53a-3 (6) has been amended since the events at issue; see Public Acts 2025, No. 25-29, § 8; that amendment is not relevant to this appeal. We therefore refer to the current revision of § 53a-3 (6).

[16] General Statutes § 53a-3 (7) defines "[d]angerous instrument" in relevant part as "any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ."

instrument." (Emphasis in original.) Id. Even in cases involving a conviction of robbery in the first degree under General Statutes § 53a-134 (a) (4), which "contains language almost identical to the language of § 53a-135 (a) (1) (B)[17] . . . a defendant need not have an operable firearm; in fact, he need not even have a gun. He need only *represent* by his words or conduct that he is so armed." (Emphasis in original; footnote added; internal quotation marks omitted.) Id., 229–30; see also *State* v. *Bell*, 93 Conn. App. 650, 670–71, 891 A.2d 9 (defendant held object under jacket that " 'looked like a gun' "), cert. denied, 277 Conn. 933, 896 A.2d 101 (2006); *State* v. *Ingram*, 43 Conn. App. 801, 807, 687 A.2d 1279 (1996) (toy gun seized from defendant's apartment was similar to that displayed during robbery), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997); *State* v. *Arena*, 33 Conn. App. 468, 471, 636 A.2d 398 (1994) (defendant held object inside bag that "looked like a gun"), aff'd, 235 Conn. 67, 663 A.2d 972 (1995).

The state presented the following evidence at trial to establish that the defendant had used or threatened the immediate use of physical force and displayed or threatened the use of what he represented by his words or conduct to be a deadly weapon or a dangerous instrument. The victim testified: "I was getting out of my car, and somebody came behind me and stuck something in the back of my head and told me to get down." He testified that "[t]hey told me to get on the ground," and he laid on the ground. He further testified that "[they] told me to do a lot of commands and stuff like that," but he did not remember the details of those commands. The victim explained that, when the person put the

---

[17] In *Hall-George*, this court explained: "The difference between the two statutes is that § 53a-135 (a) (1) (B) covers the display or threatened use of deadly weapons and dangerous instruments, as opposed to only the display or threatened use of firearms." *State* v. *Hall-George*, supra, 203 Conn. App. 229.

object to the back of his head, he felt "scared" because "[he] didn't want to get killed."

During his direct examination, the victim initially testified that he did not know what object was put to the back of his head. Immediately thereafter, however, the prosecutor asked: "[D]o you recall if it felt like a firearm or not, by the way, or no?" The victim responded: "Yeah." When the prosecutor asked: "[D]o you recall . . . did it feel like one or not?" the victim responded: "Yes, it did."

On cross-examination, the victim again indicated that he did not know what the object was, as he did not turn around to see what was there, but he confirmed that the object "felt metal." On redirect examination, the victim testified that he did not recall telling the police that it was a metal object, explaining: "I don't recall what I told [the officer] that night because it's been so long ago." When the prosecutor asked: "Do you recall telling the officers that . . . you knew that it wasn't a real gun?," the victim responded: "I recall telling them that . . . I don't think it was a real gun." When the prosecutor similarly asked: "Do you remember telling them . . . that it felt like a gun but not a real gun?," the victim responded: "Yes." On recross examination, the victim answered in the affirmative that he did not "actually see the object," that he did not know what it was, and that he "just felt something that felt like metal."

In addition, as set forth in part II A of this opinion, the state presented testimony from McCullough and McOuat that the defendant was found in the driver's seat of the victim's car only ten minutes after the incident occurred with a facsimile firearm in his pocket. McCullough explained that the facsimile firearm was "like a little pistol, a little metal pistol." He also described it

as "a heavy metal toy pistol," and "a cap gun or cap pistol . . . toy gun."

On the basis of this evidence, the trial court reasonably could conclude, as it did, that the defendant threatened the use of what he represented by his words or conduct to be a deadly weapon or a dangerous instrument, i.e., a gun, by putting a facsimile firearm to the back of the victim's head and ordering him to get on the ground, immediately prior to stealing his car.

The defendant argues that "[t]here is no evidence to show a nexus connecting the metal object that the [victim] felt on the back of his head to the facsimile firearm found on the defendant's person." We disagree. The victim's testimony that the object was metal was consistent with McCullough's testimony describing the facsimile firearm found on the defendant as being metal, specifically, "like a little pistol, a *metal* pistol," and "a heavy *metal* toy pistol." (Emphasis added.) In addition, although the defendant attempts to highlight the victim's testimony that he did not know what the object was,[18] the victim responded in the affirmative when the prosecutor asked if the object felt "like a firearm" and confirmed that he told officers that it "felt like a gun but not a real gun . . . ." Given the similarities in the descriptions of the items, the trial court reasonably could conclude that there was a sufficient nexus between the facsimile firearm found on the defendant's

---

[18] To the extent that the victim provided conflicting testimony in this regard, "[i]t was within the province of the court to resolve this inconsistent testimony." *Delena* v. *Grachitorena*, 216 Conn. App. 225, 233, 283 A.3d 1090 (2022); see also *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony"); *Hospital Media Network*, *LLC* v. *Henderson*, 209 Conn. App. 395, 430, 268 A.3d 657 (2021) ("a trier of fact is free to credit one version of events over the other, even from the same witnesses" (internal quotation marks omitted)), cert. denied, 343 Conn. 916, 274 A.3d 867 (2022).

person and the object put to the back of the victim's head during the robbery.

In addition, we reject the defendant's suggestion that the evidence was insufficient because the victim did not see or directly observe the object put to the back of his head. Although the victim did not *see* the object, he could *feel* that the object felt "like a firearm . . . ." To the extent that the defendant attempts to highlight the victim's testimony that he told the police that the object did not feel like a "real gun," we emphasize that the victim also testified that he felt "scared" because "[he] didn't want to get killed."

Moreover, although the defendant's command to the victim to "get on the ground" did not in and of itself express a threat of physical force or express that the defendant was armed with a firearm, that statement must be taken together with the defendant's conduct in putting the facsimile firearm to the back of the victim's head. See *State* v. *Hall-George*, supra, 203 Conn. App. 231 (describing cases in which "[t]he defendants' conduct *and* words . . . were sufficient for the juries to reasonably infer that the defendants wanted the victims to *think* that they had firearms" (emphasis in original)).

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the trial court reasonably could have found beyond a reasonable doubt that the defendant represented that he had a deadly weapon or a dangerous instrument, i.e., a firearm, and that, by putting it to the back of the victim's head and ordering him to get on the ground, the defendant threatened, by his conduct, to use that firearm if the victim did not comply. Accordingly, the evidence was sufficient for the court to find the defendant guilty of robbery in the second degree in violation of § 53a-135 (a) (1) (B).

### III

The defendant next claims that the trial court deprived him of his right to self-representation when it failed to canvass him regarding the waiver of his right to counsel after he had made a clear and unequivocal request to represent himself and, further, that the court's failure to canvass him amounts to structural error. We are not persuaded.

The following additional facts and procedural history are relevant to our resolution of this claim. At the defendant's first court appearance in the present case, on October 1, 2020, the court appointed the Office of the Public Defender to represent the defendant. On December 7, 2020, McMahon filed an appearance in lieu of the Office of the Public Defender to serve as the defendant's assigned counsel.

The defendant claims that he asserted his right to self-representation in court during the pretrial hearing on April 8, 2021. On that date, the trial court, *Baldini, J.*, held a virtual hearing to address a plea offer that had been extended by the state. After the court recited the state's plea offer on the record, the following colloquy took place:

"The Court: . . . Attorney McMahon, did you get a chance to talk to your client about that offer?

"[Defense Counsel]: Yes, Your Honor.

"The Court: Okay. And Mr. Trice, did you have enough time to speak with your attorney about that offer?

"[The Defendant]: I did . . . I would like to speak to the court alone. . . .

"The Court: Okay. So, what I want to do is . . . you said that you want to say something. Before you say something, I always tell people that, if you say something, that it could be used against you. So, if you start

talking about the case, those are all things that could be used against you. Do you understand that?

"[The Defendant]: Yes, Your Honor.

"The Court: And did . . . you want to say anything to your client, Attorney McMahon?

"[Defense Counsel]: Yes, Your Honor. Just for the record, and he knows this, I think very strongly he should not discuss the case in any way, shape, or form. Obviously, whether or not he pleads is totally up to him. I would advise him not to say anything. Having said that, he has the right to address the court if he so desires. . . .

"The Court: All right. Mr. Trice . . . what I want to know is whether or not you wish to accept or reject that offer?

"[The Defendant]: Your Honor, I reject. And I would like to speak upon my behalf . . . I want to represent myself, and I want to fire my attorney, Mr. McMahon.

"The Court: Okay. So, there's a couple of things that are going on that you just indicated. So, here's where we're at. You got the offer that was extended to you, right?

"[The Defendant]: Yes.

"The Court: Okay. Did you have enough time to talk to your attorney about that offer?

"[The Defendant]: Not at all. I tried to address the situation. And I did research upon myself . . . upon the alleged criminal offense I'm being charged with. And it seems like he's my prosecutor against me. So, I tried to talk . . . go over multiple times with him on different occasions about my innocence and he never . . . he never came to me, and we discussed these about my innocence. . . .

"The Court:  .  .  .  [Y]our attorney doesn't have the burden of proving your innocence. The state has the burden of proving your guilt beyond a reasonable doubt, which is the highest legal standard, okay? So, there's no requirement that your innocence be proven. Your attorney can provide defenses. Your attorney can't create facts. The facts are what they are. The evidence is what it is. And what I just want to make sure is, this is a big decision. So, the fact that  .  .  .  a lot of times, people come into court on the day when it's accept or reject and they express that they're not happy with their attorney, but what they're really not happy with is the offer. And so, I want to make sure that your attorney is somebody who has appeared in front of this court multiple times, so I am familiar with him and the work that he does. Unfortunately, defense attorneys sometimes have the difficult job of conveying bad news to defendants. In this situation, any offer that involves incarceration I would imagine is not good news, okay. But that's the state's offer to you to resolve your case, and what I'm hearing is that you believe that you are innocent of this charge, and you have the choice on whether or not you wish to plead guilty. So, if you don't want to plead guilty, your attorney can't make that decision for you. Your attorney can advise you of your options. Can tell you what the evidence is. Can tell you what information he knows about the case, and he can recommend to you whether or not you should take the case to trial, whether you should enter a plea to a charge. I will say that your attorney has been a pretty strong advocate for you.  .  .  .  So, I understand that you've made certain representations today.  .  .  .

"You mentioned something about firing your attorney. You have assigned counsel. So, just reminding you that, if you have an assigned attorney, you are not constitutionally allowed to have an attorney that you like,

but you are constitutionally entitled to have an attorney that is effective, who can represent you.

"The other issue that you brought up was representing yourself, okay. There are tremendous risks when someone represents themselves because, a lot of times, you will have a mindset. There are things that you think that you want to tell a judge or tell a jury, but there are rules, there are evidentiary rules that it takes years for many people to understand. . . . So, if you don't know what those rules are and you can't effectively present your case, and you represent yourself, you could put yourself in a hugely bad position if your case goes to trial.

"So, I'm just trying to tell you all those things so there are things that you can think about, and you don't have to make a decision today, but it is important for you to understand all of those things because representing yourself . . . you're not kind of separating your emotions from the logic that is necessary. Some people can do it. Most people can't, and it's very difficult. A judge can't help you out. A judge has to always remain right in the middle, neutral. So, if you're asking a judge, can I do this? Can this get admitted into evidence? The judge can't help you. So, I want you to think about all of those things. Would you like to have some more time to consider everything that I said today?

"[The Defendant]: I understand everything you said today, but I would like to speak on my defense, if you don't mind.

"The Court: Well, the one thing that we're going to do today is, we're addressing the [plea offer]. So, we're not going to try the case, okay. That's the thing, it's like, remember your attorney was correct in saying, you know, I advise you not to say anything. Because today we're not . . . we're not deciding . . . your guilt or your innocence. . . . All we're trying to figure

out is whether or not you have made a decision to accept or reject the offer. And maybe you haven't, and maybe you want more time. That's really all we're going to do today.

"[The Defendant]: Well, Your Honor, my attorney . . . [McMahon] make me fear for my life very, very bad. Like, I want to speak upon my behalf in my defense, if you don't mind, please.

"The Court: Okay. So . . . just one moment. So, when you say that you want to speak in your defense, it sounds like you want to talk about your case. And . . . keep in mind, and this is where it makes me really concerned about any efforts that you might want to have to represent yourself because you want to tell your story, right? But, in telling your story, you could say something that you might think is good for you but, in reality, the state might be listening to what you say and might write that down or might ask for a copy of the transcript and use that against you if the case goes to trial, okay. Just remember, you do not have to prove that you're innocent. It's their job. So, a lot of times, the reasons why a defense attorney just like Attorney McMahon would say . . . don't say anything. . . . [L]et them sustain their burden, their job. Their burden of proof, which is the highest standard, beyond a reasonable doubt. So, if you want to go and start talking about your case, of course, you could do that, but, in fact, you could actually be helping the state with their case, and that's something that sometimes people don't realize that. . . . And let me also remind you that, sometimes when your attorney talks to you about your case and strategy, you might not agree with it, but his experience, the number of cases that he's handled here in this court alone are many. He does a lot of work throughout the state, but he appears here regularly. So, he has some experience with these kinds of cases. Sometimes, you might not agree with his strategy, but

that's not a reason in and of itself to allow you to get a new lawyer or be allowed summarily to represent yourself. So, I just want you to know that, too. . . . I told you a lot of things today. So, I'm thinking that maybe we pick another time for you to come back and address your case. . . . I think that's probably . . . a better strategy."

After the defendant asked the trial court about his charges; see part I of this opinion; he expressed that he thought McMahon was "illegally obtaining evidence against [him]" and that McMahon was "going up against [him]" because McMahon "want[ed] [him] to cop out to robbery in the first degree [and] conspiracy to commit robbery in the first degree."

The defendant subsequently stated: "Your Honor, I do not want Mr. McMahon representing me no more." The court responded: "Okay. Well, I haven't had the opportunity to address the issue. I have not been satisfied with what has been presented. I am going to ask you . . . we can address that on the next court date because this is the first time. So, if you refuse to talk to your attorney, there's no guarantee that you're going to get a new attorney. I went through, I believe in detail today, what I believe to be the options that you have, what the obligations are with your attorney, the risks of self-representation. I believe we can adequately address any issues that you have on the next court date. But I do, given what you presented today . . . I am not going to discuss that issue because it wasn't one that we intended to address today. So, May 13th, 10:30. Happy to address anything on that date."

At the start of the next court date, on May 13, 2021, the trial court stated: "We last spoke on the record on April 8, 2021. And we had some conversations on that date. There is an existing offer to resolve [the defendant's] matter. And the matter was continued to today

for additional discussions. So, can we have an update on where things stand?"

McMahon responded: "Yes, Your Honor. My client's advised me that he does wish to reject the offer." The court recited the terms of the plea offer and asked the defendant whether he had received that offer, the defendant responded: "I was told that by my attorney, Your Honor. And last time I was in court, I spoke about me and my attorney always having difficulty between him representing me in a court of law. So, I would like to know if I could read for the record what I wrote down, and thank you." After additional discussion, in which the defendant expressed his dissatisfaction with McMahon, the trial court permitted the defendant to read his written statement challenging the state's ability to charge him with robbery in the first degree by way of its substitute information. As explained in part I of this opinion, the court expressed its concern that "maybe there might be some issues" with the defendant's ability to understand the proceedings or to assist in his defense, given his reliance on inapplicable case law, and McMahon stated that he did not "share that position" regarding the court's uncertainty about the defendant's competence.

The court then stated in relevant part: "I want to make sure that you understand what's going on here. And I want to make sure that I understand that, if you don't want to accept the offer, that that's what your decision is and that you've had enough time to evaluate it. So, can you respond to that, please?" The defendant responded: "Your Honor, I do not have enough time at all." The court told the defendant that it would give him more time to talk to his attorney and to consider the plea offer, and explained to the defendant that it was ultimately his decision whether he wanted to accept the plea offer. When the court asked the defendant whether he understood, he responded: "Yes."

After additional discussion with the trial court, the defendant asked: "Your Honor, have you ever approved upon me getting new counsel?" The court explained to the defendant, among other things, that asking for a new attorney was "not so simple" and that "there's nothing that I've heard from you or from your attorney that raises the question that your attorney is not doing what he's supposed to be doing on your behalf." The court told the defendant, "we will talk about it on the next [court] date," which it then scheduled for June 24, 2021.

The defendant subsequently filed a pro se motion for a speedy trial, which was dated June 1, 2021. In the substance of that motion, the defendant requested, inter alia, a "motion to dismiss counsel" and a "motion to [appoint] a new counsel," to take place before a speedy trial.

The court addressed the defendant's motion at the hearing on June 24, 2021. The court explained to the defendant that it could not act on the motion for a speedy trial that the defendant had filed in a self-represented capacity unless McMahon adopted that motion because "hybrid representation" is not permitted pursuant to *State* v. *Gethers*, 197 Conn. 369, 382, 385, 497 A.2d 408 (1985). After the court addressed the state's plea offer that had been discussed at the April 8 and May 13, 2021 hearings, and the defendant confirmed that he was rejecting that offer, the court asked McMahon whether he was adopting the defendant's motion for a speedy trial. McMahon responded: "I am not. He does not want me as his lawyer."

The defendant expressed concerns he had with McMahon's representation of him, stating, inter alia, "I feel like he's not with me; he don't represent me at all," and, "I'm not understanding how I'm being charged with robbery, or I will go to trial with robbery, and, like, I

fear for my life right now because Mr. McMahon, he don't help me at all, and I'm not understanding . . . ." After additional discussions between the trial court, the defendant, and McMahon, the defendant asked the court whether it was denying his motion for a new attorney. The court recognized the defendant's "wish to have another attorney represent [him]" and stated that it would "entertain this as a motion for a change of counsel in [the defendant's] matter." The court found that there was not good cause to dismiss McMahon as the defendant's counsel because, inter alia, there had not been a breakdown in the communication so severe that McMahon's ability to represent the defendant was impaired. Accordingly, the court denied the defendant's motion for new counsel.

Subsequently, however, on June 6, 2022, McMahon filed a motion to withdraw his appearance on the ground that the attorney-client relationship had broken down. The court addressed McMahon's motion to withdraw at a hearing on September 2, 2022. After the defendant rejected another plea offer from the state, McMahon addressed the court: "Well, Your Honor, the other thing is that he no longer wants me as his lawyer. He's made it clear for the past two or three months that he either wants to go pro se or he wants to proceed with another standby counsel. It was my understanding with him that this [plea deal] would resolve the entire matter. He wanted to go forward with me. Obviously, now with this change, I assume that he wants me to withdraw from the case because he's been asking for this for a while." After confirming with both McMahon and the defendant that the attorney-client relationship had broken down, the court granted McMahon's motion to withdraw his appearance.

The trial court then told the defendant, "I've got to figure out who your lawyer's going to be," and explained that it was going to set a new court date and that he

probably would be assigned another special public defender.[19] The defendant responded, "Yes, Your Honor," and the court directed an attorney from the Office of the Public Defender to assign a new special public defender for the defendant.

On September 7, 2022, Attorney Jennifer M. Buyske filed an appearance in lieu of McMahon as the defendant's assigned counsel. Thereafter, the defendant did not voice any dissatisfaction with his representation and did not express any desire to represent himself.

The following legal principles guide our analysis of the defendant's claim that the trial court violated his right to self-representation. "The sixth amendment to the United States constitution provides in relevant part: In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense. The sixth amendment right to counsel is made applicable to state prosecutions through the due process clause of the fourteenth amendment. . . . In *Faretta* v. *California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), the United States Supreme Court concluded that the sixth amendment [also] embodies a right to self-representation and that a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." (Internal quotation marks omitted.) *State* v. *Ghant*, 212 Conn. App. 662, 676–77, 276 A.3d 1004, cert. denied, 345 Conn. 901, 282 A.3d 465 (2022). "Article first, § 8, of the constitution of Connecticut

---

[19] Specifically, the court stated: "[W]e'll have to get the [Office of the] Public Defender involved to see if there's another standby counsel, and we will have to get a new date to see if he qualifies for a special public defender and standby counsel, and then we can see where the case is heading, to either canvass him or what the representation is going to be. At the point, this will be excludable time until we figure out what the proper representation is going to be. So, I'm going to give you a new court date, Mr. Trice, so you can meet . . . we'll probably get you a new special public defender, and then you can talk with that lawyer to see where the case is heading. Okay?"

also guarantees the right to self-representation by providing: 'In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . .' " *State* v. *Shashaty*, 251 Conn. 768, 771 n.3, 742 A.2d 786 (1999), cert. denied, 529 U.S. 1094, 120 S. Ct. 1734, 146 L. Ed. 2d 653 (2000).

"It is well established that [t]he right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . .

"State and federal courts consistently have discussed the right to self-representation in terms of invoking or asserting it . . . and have concluded that there can be no infringement of the right to self-representation in the absence of a defendant's proper assertion of that right. . . . The threshold requirement that the defendant clearly and unequivocally invoke his right to proceed [as a self-represented party] is one of many safeguards of the fundamental right to counsel. . . . Accordingly, [t]he constitutional right of self-representation depends . . . upon its invocation by the defendant in a clear and unequivocal manner. . . . In the absence of a clear and unequivocal assertion of the right to self-representation, a trial court has no independent obligation to inquire into the defendant's interest in representing himself . . . . Conversely, once there has been an unequivocal request for self-representation, a court must undertake an inquiry [pursuant to Practice

Book § 44-3],[20] on the record, to inform the defendant of the risks of self-representation and to permit him to make a knowing and intelligent waiver of his right to counsel. . . . The inquiry mandated by . . . § 44-3 is designed to ensure the knowing and intelligent waiver of counsel that constitutionally is required." (Citation omitted; footnote in original; internal quotation marks omitted.) *State* v. *Ghant*, supra, 212 Conn. App. 677–78.

Conversely, "[w]hen a defendant's assertion of the right to self-representation is not clear and unequivocal, recognition of the right becomes a matter entrusted to the exercise of discretion by the trial court. . . . In the exercise of that discretion, the trial court must weigh into the balance its obligation to indulge in every reasonable presumption against waiver of the right to counsel." (Internal quotation marks omitted.) *State* v. *Paschal*, 207 Conn. App. 328, 335, 262 A.3d 893, cert. denied, 340 Conn. 902, 263 A.3d 387 (2021), cert. denied, U.S.    , 142 S. Ct. 1395, 212 L. Ed. 2d 341 (2022).

On appeal, the defendant claims that he clearly and unequivocally invoked his right to self-representation at the April 8, 2021 pretrial hearing when he stated, "I would like to speak upon my behalf . . . I want to represent myself and I want to fire my attorney, Mr. McMahon." The defendant further claims that, despite

---

[20] " 'Practice Book § 44-3 provides: A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

" '(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

" '(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

" '(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

" '(4) Has been made aware of the dangers and disadvantages of self-representation.' " *State* v. *Ghant*, supra, 212 Conn. App. 678 n.3.

this clear and unequivocal invocation, the trial court failed to conduct an inquiry pursuant to Practice Book § 44-3, thereby violating his right to self-representation under the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[21] The state argues that the defendant did not make a clear and unequivocal request to represent himself, and, in the alternative, even if he did make a clear and unequivocal request to represent himself, the court did not clearly and conclusively deny his request, and the defendant subsequently waived his right to self-representation by accepting the appointment of replacement counsel. We conclude that, even if we assume, without deciding, that the defendant's statement at the April 8, 2021 hearing constituted a clear and unequivocal request to represent himself, the court did not clearly and conclusively deny that request and the defendant subsequently waived his right to self-representation.

"Although a court is required to conduct a canvass pursuant to Practice Book § 44-3, once a defendant has clearly and unequivocally invoked his right to self-representation; see *State* v. *Paschal*, supra, 207 Conn. App. 334; our Supreme Court explained in *State* v. *Braswell*, 318 Conn. 815, 842 n.8, 123 A.3d 835 (2015), that there may be some circumstances in which a defendant asserts his right to self-representation but subsequently waives that right before a court clearly and conclusively denies his request. The court in *Braswell* explained: '[If] a trial court has not clearly and conclusively denied a defendant's request to represent himself, the defendant may subsequently waive such a request. But, [if]

---

[21] Although the defendant refers in his appellate brief to the right to self-representation afforded under article first, § 8, of the Connecticut constitution, he has not provided an independent analysis of his state constitutional claim in accordance with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Therefore, we limit our review of the defendant's claim to his right to self-representation under the federal constitution. See, e.g., *State* v. *Ghant*, supra, 212 Conn. App. 664 n.1.

a court has clearly and conclusively denied the request, the defendant does not waive his right to self-representation by subsequently acquiescing in being represented by counsel or by failing to reassert that right.' Id., 843–44." *State* v. *Ghant*, supra, 212 Conn. App. 679–80; see also *United States* v. *Barnes*, 693 F.3d 261, 271 (2d Cir. 2012) ("even after the right to proceed pro se has been clearly and unequivocally asserted, the right may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether" (internal quotation marks omitted)), cert. denied, 568 U.S. 1113, 133 S. Ct. 917, 184 L. Ed. 2d 704 (2013).

"The court in *Braswell* made clear that '[t]his does not mean, however, that, after a defendant's clear and unequivocal request to represent himself, a trial court may simply ignore such a request and proceed to a critical stage of the proceedings, and thereby avoid any error simply because it did not make a clear and conclusive ruling on the defendant's request. . . . [O]nce a defendant has clearly and unequivocally invoked his right to self-representation, the trial court is obligated to conduct a canvass in accordance with Practice Book § 44-3 to determine if his waiver of counsel is knowingly and intelligently made. Our decision in this case does not alter that obligation. Instead, it suggests there may be some instances in which a defendant asserts and subsequently waives his right to self-representation before a court clearly and conclusively rules on the defendant's request. In such instances, it is possible that there are circumstances in which the trial court's delay in ruling on the request would not constitute error.' [*State* v. *Braswell*, supra, 318 Conn. 842 n.8].

"Our Supreme Court explained its reasoning behind this rule: 'Although a defendant does not have to reassert his right to self-representation once it has been

clearly denied by the court . . . we have never held that there is no obligation to renew such claim [if] the court does not address it. It seems to us that there is a significant difference between a defendant who waives or forfeits his right to self-representation after a clear ruling and one who waives or forfeits the right when there has been no such ruling. In the former situation, it is likely that the waiver or forfeiture is precipitated by the denial. . . . In the latter situation, contrarily, there has been no court action that would suggest that the reassertion of one's right would be futile.' . . . Id., 841 n.8." *State* v. *Ghant*, supra, 212 Conn. App. 680–81.

In the present case, the defendant acknowledges that the trial court did not explicitly rule on his purported request to represent himself. Nevertheless, he argues that the court, in effect, clearly and conclusively denied his request because "[t]he court's repeated instructions that he needed to continue to work with his defense attorney caused the defendant to believe that a further request would be anything more than futile." We disagree.

It is clear from the record that the matter of the defendant's representation was still open for discussion. See *State* v. *Paschal*, supra, 207 Conn. App. 338 (defendant's request to represent himself was not conclusively denied where it was "clear from the record that both the defendant and the court considered the matter of the defendant's representation still open for discussion"); see also *Wilson* v. *Walker*, 204 F.3d 33, 38 (2d Cir.), cert. denied, 531 U.S. 892, 121 S. Ct. 218, 148 L. Ed. 2d 155 (2000). At the conclusion of the hearing on April 8, 2021, the defendant stated, "I do not want [McMahon] representing me no more," and the court responded in relevant part, "[w]ell, I haven't had the opportunity to address the issue . . . we can address that on the next court date . . . ." In addition, the court

explicitly referenced the issue of self-representation and stated, again, that it could address any issues on the next court date. Specifically, the court told the defendant: "[I]f you refuse to talk to your attorney, there's no guarantee that you're going to get a new attorney. *I went through, I believe in detail today, what I believe to be the options that you have, what the obligations are with your attorney, the risks of self-representation. I believe we can adequately address any issues that you have on the next court date.* But I do, given what you presented today . . . I am not going to discuss that issue because it wasn't one that we intended to address today. So, May 13th, 10:30. *Happy to address anything on that date.* Okay?"[22] (Emphasis added.) Because the court did not rule on the defendant's request to represent himself at the April 8, 2021 hearing and, instead, made clear that "the question of self-representation was left open for possible further discussion"; *Wilson* v. *Walker*, supra, 204 F.3d 38; we conclude that the defendant's request was not clearly and conclusively denied.

Moreover, the trial court did not "simply ignore [the defendant's] request and proceed to a critical stage of the proceedings"; *State* v. *Braswell*, supra, 318 Conn. 842 n.8; as the defendant suggests. Instead, the court acknowledged the defendant's request, which was made directly after the defendant stated that he wanted to reject the state's plea offer, and expressed concern that the defendant may be having an emotional reaction to his dissatisfaction with his counsel's advice during the plea negotiation process.[23] See *State* v. *Paschal*, 207

---

[22] The trial court also stated, more broadly, that "we're going to have an opportunity for you to speak with your attorney. At this point, we're not focused on what we had intended to do today. *There are some issues that have come up. Certainly, we can discuss them further on May 13th.*" (Emphasis added.)

[23] As set forth previously, the trial court told the defendant, in relevant part, that, "a lot of times, people come into court on the day when it's accept or reject and they express that they're not happy with their attorney, but what they're really not happy with is the offer."

Conn. App. 335 (in considering whether reference to self-representation was clear and unequivocal request, court may consider "whether a request is the result of an emotional outburst" (internal quotation marks omitted)).

After additional discussion between the trial court and the defendant, during which the defendant stated that he did not know or understand the charges against him, the court expressed that it had some possible concerns with the defendant's competence. The court continued the matter for additional discussions to take place between the defendant and McMahon, and the court asked McMahon to bring to the court's attention any concerns he had from those discussions about the defendant's ability to understand the proceedings or to assist in his defense.[24]

Given the trial court's potential concern about the defendant's competence[25]—along with its duty to ensure that any waiver of the defendant's right to counsel would be knowingly and intelligently made—the court reasonably declined to conduct a canvass of the defendant at the April 8, 2021 hearing and, instead, continued the matter in an abundance of caution to

[24] Specifically, the trial court stated: "I'm going to continue your case to allow you to have another conversation with your attorney, and then I'm also going to just make sure . . . I'm going to ask Attorney McMahon in those subsequent conversations that I anticipate you're having, if there's any conversations that you have that lead you to think that maybe this defendant doesn't understand the proceedings against him or assisting in his defense that you'll bring that to the court's attention. *It's not apparent to me at this point*, but it could be something that might require further discussion in the future, okay." (Emphasis added.)

[25] As we explained in part I of this opinion, the record does not reflect substantial evidence of mental impairment. The trial court, however, was reasonably cautious given the defendant's statements that he did not know or understand the charges against him, particularly in light the more stringent standard for competence applied in the context of self-representation. See *State* v. *J.M.F.*, 170 Conn. App. 120, 163 n.14, 154 A.3d 1, cert. denied, 325 Conn. 912, 159 A.3d 230 (2017).

provide time to resolve that concern. As we set forth in more detail in part I of this opinion, continuing the matter enabled the court to obtain McMahon's opinion, after additional discussions with the defendant, that he did not share the court's concern. In addition, the defendant's statements at the May 13, 2021 hearing confirmed that his remarks about not understanding the charges against him reflected more on his lack of legal experience than it did on his mental condition. Accordingly, although a court typically *must* canvass a defendant in accordance with Practice Book § 44-3 after he makes a clear and unequivocal request to represent himself; see *State* v. *Bush*, 325 Conn. 272, 318, 157 A.3d 586 (2017); the court's decision not to do so under the particular circumstances of the present case did not, in and of itself, amount to a denial of the defendant's right to self-representation. See *United States* v. *Barnes*, supra, 693 F.3d 274 (court declined to rule on defendant's request to represent himself until there had been competency evaluation, and, after competency evaluation, there was no further mention of self-representation request); see also *State* v. *Ghant*, supra, 212 Conn. App. 686 (court acknowledged but did not rule on defendant's request to represent himself and continued matter based on concern about talking to defendant about his request without his attorney present); *State* v. *Paschal*, supra, 207 Conn. App. 338 (court denied without prejudice defendant's request to represent himself and continued matter to afford defendant's counsel opportunity to obtain video from state in accordance with defendant's expressed goals).

In light of our conclusion that the trial court did not clearly and conclusively deny the defendant's request to represent himself, we must next consider whether the defendant reasserted his right to self-representation after the April 8, 2021 hearing. The defendant argues

that he subsequently attempted to proceed pro se by filing motions on his own behalf. We are not persuaded.

Although the defendant filed a pro se motion for a speedy trial on June 1, 2021, the filing of that motion in a self-represented capacity did not reflect the defendant's desire to represent himself given that it included a "motion to [appoint] a new counsel." Both this court and our Supreme Court have repeatedly held that "[t]he right to counsel and the right to self-representation present mutually exclusive alternatives." (Internal quotation marks omitted.) *State* v. *Joseph A.*, 336 Conn. 247, 254, 245 A.3d 785 (2020); *State* v. *Paschal*, supra, 207 Conn. App. 333. Indeed, after the April 8, 2021 hearing, the defendant repeatedly expressed a desire for a different attorney, rather than a desire to represent himself, as reflected (1) at the May 13, 2021 hearing when he asked the trial court: "Your Honor, have you ever approved upon me getting new counsel?"; (2) in his June 1, 2021 motion, when he requested that a "motion to dismiss counsel" and a "motion to [appoint] a new counsel" be considered before his speedy trial; and (3) at the June 24, 2021 hearing, when he asked the court whether it was denying his "motion for a new attorney . . . ." In addition, although the court initially denied the defendant's request for new counsel, the defendant acquiesced to being represented by a different attorney after the court granted McMahon's motion to withdraw his appearance on September 2, 2022. The defendant did not subsequently voice any dissatisfaction with his replacement counsel and did not express any desire to represent himself. The defendant, therefore, waived his right to self-representation. See *State* v. *Ghant*, supra, 212 Conn. App. 688 (defendant waived right to self-representation when he "acquiesced to being represented by counsel" at subsequent hearings);

see also *Wilson* v. *Walker*, supra, 204 F.3d 39 (highlighting defendant's apparent cooperation with replacement counsel and failure to voice any dissatisfaction after original counsel's withdrawal from case).

Finally, we note that the defendant's assertion that the trial court's alleged error is structural and subject to automatic reversal does not contradict our conclusion that the defendant waived his right to represent himself.[26] Although neither the United States Supreme Court nor our Supreme Court has expressly addressed the issue of waiver in the context of a claim of structural error, several federal circuit courts of appeals have concluded that a party may waive a structural error. See, e.g., *United States* v. *Pancholi*, Docket No. 24-1127, 2025 WL 2218478, *10 (6th Cir. August 5, 2025) ("the fact that the violation would constitute structural error does not mean that a defendant cannot waive the underlying right"); *Jackson* v. *Bartow*, 930 F.3d 930, 934 (7th Cir. 2019) ("the consequence of a 'structural' error is that it is not subject to harmless-error review . . . but such errors can still be waived" (citation omitted)); *Wilson* v. *Walker*, supra, 204 F.3d 37–38 (concluding that defendant's "failure to reassert his desire to proceed pro se constituted a waiver of his previously asserted [s]ixth [a]mendment right," despite recognition that "a court's denial of the right to self-representation is not subject to harmless error analysis, and requires automatic reversal of a criminal conviction"); see also Z. Henderson, "A Comprehensive Consideration of the Structural-Error Doctrine," 85 Mo. L. Rev. 965, 1008–10 (2020) (discussing rationale behind courts' application of waiver doctrine in context of claims of structural error).

---

[26] Our Supreme Court has held that "the improper denial of the right to self-representation is a structural error, requiring a new trial." *State* v. *Petteway*, 351 Conn. 682, 692, 332 A.3d 196 (2025); see also *State* v. *Braswell*, supra, 318 Conn. 846–47; *State* v. *Jordan*, 305 Conn. 1, 23, 44 A.3d 794 (2012).

In sum, even if we assume that the defendant clearly and unequivocally requested to represent himself on April 8, 2021, the trial court did not conclusively deny that request. During the remainder of the proceedings, the defendant did not clearly and unequivocally reassert the right to self-representation. Accordingly, the defendant waived his right to represent himself.

IV

Finally, the defendant claims that the trial court improperly admitted into evidence certain hearsay statements. Specifically, he argues that the court abused its discretion in allowing testimony from McCullough regarding the victim's out-of-court statement describing the suspects as "fat" and "skinny." We conclude that the defense opened the door to the challenged testimony and, therefore, that the trial court did not abuse its discretion in permitting the state to elicit that testimony.

The following additional facts and procedural history are relevant to this claim. At trial, the state sought to elicit testimony from McCullough regarding the differences in the physical appearances of the defendant and V. On direct examination, the prosecutor asked: "Was there a difference in body size between the two individuals?" McCullough responded: "The way that [the victim] identified them, yes, very much so." The prosecutor followed up, asking: "When *you* physically saw the two individuals, was there a difference in body type, by the way?" (Emphasis added.) McCullough responded, "[y]es, sir." When the prosecutor asked what the difference in the body types was, McCullough began to respond with the description that the victim had provided to the police on the night of the incident, rather than his own observations. The court sustained defense counsel's subsequent objections to the testimony on the basis of hearsay and because the testimony was

not responsive to the question posed. Finally, the prosecutor asked: "Without . . . telling us what [the victim] said the difference between the body types was, did you observe the difference in the body types between the two individuals?" McCullough responded, "[y]es," explaining that "[o]ne was heavier set than the other," and the defendant was the heavier set individual.

On cross-examination, defense counsel sought to elicit testimony from McCullough about the alleged lack of detail that the police had about the identity of the suspects. The following colloquy took place:

"[Defense Counsel]: Now, in this specific case, [the victim] was the only person who was at the scene of the robbery; right?

"[McCullough]: Yes.

"[Defense Counsel]: Okay. He's the one that called 9-1-1.

"[McCullough]: Yes, ma'am.

"[Defense Counsel]: He didn't know who the robber was.

"[McCullough]: No, ma'am.

"[Defense Counsel]: He didn't provide a lot of description.

"[McCullough]: We had a general description.

"[Defense Counsel]: Of the car, right?

"[McCullough]: And of the people that took the car.

"[Defense Counsel]: So, you're saying that he gave details about the individual who took the car.

"[McCullough]: Very generic details."

Defense counsel continued to question McCullough about alleged inadequacies in the police investigation,

such as the failure to locate any surveillance footage, the failure to speak to anyone in the neighborhood about the incident, and the failure to conduct a showup identification procedure. In addition, defense counsel sought to highlight that V was found with gloves on and had a backpack with two "[r]eal" knives in it.

The prosecutor attempted to address these alleged inadequacies on redirect examination. For instance, the prosecutor elicited testimony from McCullough about how he did not speak to anyone in the neighborhood because the incident had happened at approximately 3:48 a.m., no one else was on the street in the victim's location at that time, and he did not see any lights on in the victim's apartment building. In addition, the following colloquy occurred between the prosecutor and McCullough:

"[The Prosecutor]: Counsel specifically asked you the question . . . and when she started her questioning on that, and she phrased it, 'you didn't have a description of the individuals.' Do you recall that question?

"[McCullough]: . . . [S]ort of. Yes, sir.

"[The Prosecutor]: Okay. Did you have a description of the individuals?

"[McCullough]: . . . [A] vague one, yes, sir.

"[The Prosecutor]: When you say a 'vague one,' what was the general description you had?

"[McCullough]: . . . [T]wo males with medical masks with hoods covering their heads, and dark clothing.

"[The Prosecutor]: Okay.

"[McCullough]: . . . [A]nd the physical description, also.

"[The Prosecutor]: Did you have a description of the individual who put the object to [the victim's] head, by the way? . . . Did you have a description of them?

"[McCullough]: A basic description, yes.

"[The Prosecutor]: What was that basic description?

"[McCullough]: He described the one as fat and one as skinny. And the one with the—"

Before McCullough could finish his response, defense counsel objected on hearsay grounds. The prosecutor argued to the trial court that defense counsel had opened the door to this inquiry during her questioning of McCullough on cross-examination. Specifically, the prosecutor argued: "Counsel had opened the door regarding when she specifically asked it . . . that indicating that the officer did not have a description. I believe that she's opened the door to that, that I have a right to ask the officer whether in fact he had a description."

The trial court agreed with the prosecutor, stating: "I think that's . . . a fair point. I'll allow it. The door's been opened." The prosecutor then asked McCullough: "What was the, again, the general description that you had of the individual that had the object [on the victim] versus the other individual?" McCullough responded: "[H]e described the one with the weapon as a . . . fat person." McCullough further testified that, on the basis of his own observations of the defendant and V, he would describe V as "slim" and the defendant as "[h]eavier set than [V]."

On appeal, the defendant argues that the trial court improperly admitted McCullough's testimony as to the victim's statement describing the suspects because "[the] statement is hearsay within hearsay [for] which

there are no exceptions."[27] The defendant contends that the court abused its discretion in concluding that defense counsel had opened the door to the admission of this testimony. Specifically, the defendant contends that the court's ruling was based on an "incorrect recollection" of defense counsel's cross-examination[28] and that "[d]oor-opening describes a principle of relevance . . . not a hearsay exception." (Citation omitted.)

The following legal principles and standard of review are relevant to our resolution of this claim. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should

---

[27] The defendant describes the statement as "hearsay within hearsay" because the victim's statement was relayed to McCullough through a dispatch officer.

[28] The defendant does not explain how the trial court's recollection of defense counsel's cross-examination was incorrect.

balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Internal quotation marks omitted.) *State* v. *Brown*, 309 Conn. 469, 479, 72 A.3d 48 (2013); see also *State* v. *Paulino*, 223 Conn. 461, 467, 613 A.2d 720 (1992); *State* v. *Graham*, 200 Conn. 9, 13–14, 509 A.2d 493 (1986).

"We review for abuse of discretion the trial court's determination that a party has opened the door to otherwise inadmissible rebuttal evidence." *State* v. *Brown*, supra, 309 Conn. 479–80. "Generally, a trial court abuses its discretion when the court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . When this court reviews a decision of the trial court for abuse of discretion, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable. . . . Accordingly, the abuse of discretion standard reflects the context specific nature of evidentiary rulings, which are made in the heat of battle by the trial judge, who is in a unique position to [observe] the context in which particular evidentiary issues arise and who is therefore in the best position to weigh the potential benefits and harms accompanying the admission of particular evidence." (Internal quotation marks omitted.) *State* v. *Frazier*, 181 Conn. App. 1, 23, 185 A.3d 621, cert. denied, 328 Conn. 938, 184 A.3d 268 (2018).

We conclude that the trial court did not abuse its discretion in admitting McCullough's testimony as to the victim's statement because the court properly determined that defense counsel had opened the door to the admission of that evidence. In the present case, after the court excluded the testimony about the victim's statement during the state's direct examination of

McCullough, defense counsel, during cross-examination, delved into the subject of what information the police had about the suspects' identities. After eliciting testimony that the victim was the only person who was at the scene of the robbery and that he did not know who the robber was, defense counsel implied that the police did not have an adequate description of the robber by stating that the victim "didn't provide a lot of description." When McCullough responded that he did have a "general description," defense counsel continued to imply that the police did not have a description of the individual who had robbed the victim by stating, "[o]f the car, right?" Although McCullough clarified that he did, in fact, have a description of the individuals who took the victim's car, he further testified that he had only "[v]ery generic details."

Defense counsel's inquiry and McCullough's answer could have left the trial court, as the fact finder, with the false impression that the police did not have a more specific description of the individual who had robbed the victim. See *State* v. *Frazier*, supra, 181 Conn. App. 25 (cross-examination opened door to challenged testimony where defense counsel's inquiry and witness' response reasonably could have left jury with false impression). In addition, defense counsel's subsequent inquiry about how V was wearing gloves and had knives in his backpack implied that V, rather than the defendant, had robbed the victim.

The state's follow-up on redirect examination and the admission of the victim's statement through McCullough's testimony served to remove any unfair prejudice that might have otherwise ensued from defense counsel's inquiry on cross-examination. The state's follow-up demonstrated that the police had a more specific physical description of the individuals who were involved in the robbery and that, from that information, they could determine that the defendant, rather than

V, had been the individual who put a weapon to the back of the victim's head. As both this court and our Supreme Court have observed, "[t]he defendant cannot reap the benefits of inquiry into one subject and expect the state's questioning within the same scope to be held impermissible." (Internal quotation marks omitted.) *State* v. *Frazier*, supra, 181 Conn. App. 25; see also *State* v. *Brown*, supra, 309 Conn. 482.

Accordingly, even though McCullough's testimony would otherwise have been inadmissible under the rule against hearsay, as the court ruled during the prosecutor's direct examination, defense counsel's inquiry opened the door to the admission of such evidence. See, e.g., *State* v. *Colon*, 71 Conn. App. 217, 234, 800 A.2d 1268 (rejecting defendant's argument "that the doctrine on opening the door is not a recognized hearsay exception," and concluding, instead, that hearsay testimony was properly admitted after defendant opened door to such evidence), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002); see also *State* v. *Brown*, supra, 309 Conn. 479 (pursuant to doctrine on opening door, court may permit rebuttal evidence "[e]ven though the rebuttal evidence would ordinarily be inadmissible on other grounds" (internal quotation marks omitted)). We conclude, therefore, that the trial court did not abuse its discretion in permitting the state to rebut the evidence adduced by defense counsel regarding the victim's statement describing the suspects.

The judgment is affirmed.

In this opinion the other judges concurred.